JOHN JACOB SPEISER, Respondent, v. EMMA SPEISER, Appellant.

Kansas City Court of Appeals, April 5, 1915.

1. DIVORCE: Settlement: Public Policy. Agreements for separation and for settlement of property interest between a discordant husband and wife, when fair and reasonable are upheld by the courts, if made in prospect of an immediate separation; but such agreements between parties living together amicably and without a present intention to separate are *held* to be against public policy and void, since they have a tendency to promote separation and divorce.

2. ————: Alimony Pendente Lite. A destitute wife is entitled to suit money as a means of defending her husband's suit for divorce or for prosecuting an action for divorce against him.

Appeal from Sullivan Circuit Court.—*Hon. Fred Lamb*, Judge.

REVERSED AND REMANDED (*with directions*).

*D. M. Wilson, J. W. Clapp* and *R. D. Jones* for appellant.

*J. W. Bingham* and *R. E. Ash* for respondent.

JOHNSON, J.—This is an action for divorce begun in the circuit court of Sullivan county, November 26, 1913. The petition alleges that the parties were married May 19, 1913, and lived together as husband and wife in Sullivan county until July 13th of that year. The ground on which a divorce is prayed is that defendant offered plaintiff such indignities as to render his condition intolerable. The nature of the pleaded indignities will be disclosed in the statement of facts.

May 5, 1914, defendant filed an answer and cross-petition in which she prayed for a divorce on the ground of indignities and on the same date filed a motion for alimony *pendente lite* and suit money. She alleged in the motion that she was destitute of means of support and for the defense of the action and the prosecution of her cross-petition, and that plaintiff owned real and personal property of the value of $3000. It was admitted at the hearing of this motion that plaintiff "had personal property to the amount of $1300 or $1400 and owns eighty acres of land which he had contracted to sell for $4600, there being a loan on it for $1200," and it was shown that defendant was living in Millbank, South Dakota, where she was employed in domestic service at three dollars per week, and that the only property she had was about sixty dollars in money.

The court overruled the motion and proceeded to try the case on the merits. Defendant was not present but was represented by counsel. Her deposition had been taken and was read at the trial as well as on the hearing of the motion. She had also had the deposition

of her employer at Millbank taken and it was read at the trial. No other evidence was offered by defendant.

Plaintiff appeared in person and testified and also introduced a number of witnesses. The court rendered a decree in his favor, and dismissed the cross-petition. Defendant appealed and her counsel contend that the court erred both in overruling her motion for temporary alimony and suit money and in rendering judgment for plaintiff on the merits. The material facts in the case are as follows: The parties are German and first were married in Switzerland in 1875. They came to the United States in 1882 and lived two or three years in Burlington, Iowa, when they moved to Missouri. They reared fourteen children and lived together until 1902 when they separated and defendant procured a divorce. She lived in Switzerland four years and then returned to Missouri and lived with a married daughter at Brookfield. She went from Brookfield to Montana where she lived until 1911 with another married daughter. In July, 1911, she removed to Millbank to serve as housekeeper for J. P. Miller, a retired farmer who was seventy-five years old and single. She remained in his service until the Spring of 1913, when she returned to Brookfield to visit her daughter. While there she and plaintiff became reconciled and were remarried and resided on his farm in Sullivan county until their final separation, when she returned to Millbank and resumed her old position with Miller. Seven of the married children of this old couple lived in Montana and defendant appears to have been anxious for plaintiff to sell his farm and remove with her to that State. She claimed that its climate agreed with her but that her health was always poor in Missouri. Defendant was trying to sell the farm and we think the testimony of both parties shows they finally agreed that defendant should go to Montana and that plaintiff would remain in Missouri until

the farm was sold and then would rejoin her, when they would live in the vicinity of their children.

Plaintiff testified: "Q. You promised her, now, if you sold this land to come to her? A. Yes. Q. And that was your understanding at the time you took her to the depot? A. Yes. Q. The day she left? A. Yes." But before defendant departed for the West she went with plaintiff to his lawyer's office at his request and signed and acknowledged a paper which she states, he represented would enable him to sell and convey the farm without waiting for her to execute the deed. She testified: "Mr. Speiser made me believe it was an agreement that if he had a chance to sell the farm he would come west." So that from the testimony of both parties it clearly appears that their mutually expressed intention was that the proposed separation would be but temporary, that it was made for the benefit of her health, and that as soon as the sale of the farm, which appeared imminent, could be effected, he would rejoin her in Montana. But the paper she signed and acknowledged at the lawyer's office recited that the parties were, at that time, "living separate and apart from each other" and that its object was that "of settling and adjusting our marital rights in all the property now owned by either of us or that we may hereafter acquire, such settlement to include dower, homestead, curtesy and all statutory and legal rights growing out of our marital relation."

Then it provided for the release by plaintiff of all his interest in her propetry "including curtesy and all statutory allowances" and followed this with the reciprocal agreement that in consideration of his promise to release and of the sum of one dollar, she released "all her marital rights in all the property real and personal now owned by her said husband or which he may hereafter acquire, including right of dower, homestead, maintenance and support and all statutory and legal rights and . . . that if the said Emma

Speiser persists in obtaining a divorce from her said husband, she shall not claim, demand or receive any alimony pending suit or otherwise.''

Defendant admits the lawyer read the paper to her before she signed it but claims she did not comprehend its meaning and thought its sole purpose was to enable plaintiff to sell and convey the land. She states she concluded to visit some German friends in Millbank on her way to Montana but on arriving at Millbank she again entered the service of Miller as housekeeper and ever since has continued in that position.

Early in the following November plaintiff entered into a contract for the sale of the farm and on being required by the purchaser to have defendant join in the execution of the deed, wrote defendant the following letter:

''Loving Emma: I have received your letter and now will send you the deed to fill out them spaces that are marked with a cross. I was in Milan and inquired about that paper which we had written in Green City; they told me it was not guilty; that lawyer that made the paper has no license to do such things so you have to go before a notary public with that title and sign it before their eyes and what it costs I will pay you for. That is not much work for you and it is a great pleasure for me. Louisa and Melvina from Hannibal were here for a week. Louisa had adopted a two-year-old girl. I think you know it already. Emma and her family were here four days. The girls took those things that belong to you with them and I think they will send them to you. Now I have sold the farm for $4800 to S. A. Martin and I will be homeless by the 1st of March.

Loving Emma do that favor to me. Fix this paper so everything will be all right. Send the title back as soon as possible and let me know how much it has cost you and I will send it back to you.

With love and honor, J. J. SPEISER.''

The letter written by defendant in reply is not in evidence but the subsance of it was that she wished to know why it was necessary for her to execute the deed. Plaintiff answered:

"Loving Emma: That is not no fake in this title. Everything has to go as the law. It just takes you five minutes in Millbank to go to a notary public and get that paper fixed. You know that a notary public must put his stamp on that paper which we made in Green City, otherwise it would be no good. Loving Emma, I have got a good price for my farm and I would be sorry if the sale goes back I wish you would help me. It takes just your name and a few minutes time. I hope you do the favor to me.

Friendly, J. J. SPEISER."

Defendant wrote (the letter is not in evidence) asking for half of the proceeds of the farm ($2400) for the execution of the deed. In his reply, plaintiff addressed her merely as "Emma," declined her offer, accused her of illicit relations with her employer and informed her that he would proceed at once to obtain a divorce. Plaintiff testified on cross-examination: "My wife and I were always on good terms until the last minute. The reason why I brought this suit for divorce is because she would not sign the deed. That is the reason; if she would sign the deed we never would have a divorce."

On re-direct he repeated that they "were on good terms the two months we lived together" and added "I was on good terms with her but she wrote to me (from Dakota) she didn't want me to come up there." From other parts of plaintiff's testimony and from the testimony of defendnt it appears that their second marital experience was not happy. Defendant admits that she received one letter from Miller of an innocent and merely friendly character, but the evidence of plaintiff tends to show that they carried on a rather active correspondence of an amatory nature. None of

the letters was introduced in evidence. Jealousy of plaintiff had been at the bottom of the first separation and whether innocent or not, the letter or letters from Miller had aroused his suspicions and caused him to reproach his wife.

Sometime after she arrived at Millbank, she wrote him: "I cannot think that you are very much interested in my welfare. I stayed with you two months, you never offered me a cent. I was sick when I left you. Now, about living there, there cannot be no such a thing after you threw up those letters to me. I will stay where I am now. Send me that hat in that box where the other hat came in." And in her deposition she stated she would not live with him again because of his charges implying infidelity on her part. Miller testified that no improper relations had existed between him and defendant and that he wrote her in a frendly way, not knowing of her remarriage, with the purpose of inducing her to resume her service as housekeeper for him.

Plaintiff testified that in one of the letters defendant received from Miller which he intercepted and read, Miller besought her to come and live with him, promising to give her a furnished house and to bequeath to her $2000 in his will, and that when plaintiff reproached defendant she said Miller had been better to her than her old father and she would like to go back to him. This is denied by defendant and since the letter was not produced the question of whether or not it was received by defendant is one of veracity between the parties.

We have stated enough of plaintiff's testimony to show how confused and self-contradictory it is. In one breath he pictures their brief marital relation as happy, and in the next, as being marred by his wife's guilty correspondence with a man with whom he implies she had sustained improper relations. In the very midst of his denunciation of her conduct he pauses

long enough to praise her as a good woman. "The woman was all right," he said, "I talked two or three times about it (to her) but I couldn't talk very long. I am too high tempered. I got mad and quit." He would make it appear that she left him with the avowed intention of going back to Miller and then counteracts this impression by saying they parted on the best of terms, with the understanding that she was going to Montana for her health and that he would follow her as soon as he could arrange his business affairs. Taking the evidence as a whole we are convinced that while there had been some irritation displayed by plaintiff over the incident of the Miller correspondence, and some resentment by defendant, there was no open breach between the parties and defendant left for Montana with the mutual understanding that plaintiff would follow her. There was no severance of the marital relationship at this time. Certainly plaintiff cannot complain of this view being taken of their relationship since it had the support of his own positive assertion that such was their purpose. This mutual expression of fidelity places the conduct of plaintiff in a light not at all creditable to him. He had full knowledge, so he says, of the Miller correspondence, and if it was of an innocent nature, i. e., consisted, as she says, of a single letter written by Miller without knowledge of defendant's recent marriage, he has committed a grave offense against his wife in charging her with immoral conduct which precludes him from occupying the position of the innocent party. To maintain an action for divorce it devolves upon the party seeking it to show not only that his spouse was guilty of the alleged misconduct but that he was innocent and faithfully discharged his reciprocal duties.

But if the Miller correspondence was of the guilty character described by plaintiff, he condoned her offense in continuing to cohabit with her with full knowledge of the fact and in agreeing to continue such co-

habitation upon their reunion in Montana, and was guilty of a most serious breach of his own marital duties when he induced her to sign and acknowledge the document he falsely represented to be a mere written authority to him to execute a deed conveying the farm, but which was in form and substance a post-nuptial settlement based on the assumption that the parties already had severed their marital relations and were living separate and apart. We find from the evidence that the lawyer who drew the document and the notary who took the acknowledgment acted in good faith in the transaction, but all of the facts and circumstances lead to the conclusion that defendant was deceived by her husband and had no understanding of the real nature of the contents of the instrument. If they had separated with the determination to live separate and apart, why did they continue together after the paper was signed and acknowledged, and then part with the avowed intention that the parting was for a time only and not a severance of their relationship?

The fact is apparent that plaintiff secretly resolved to get rid of his wife, schemed to strip her of her marital rights in his property while professing fidelity to her and pretending to comply with her wish that he dispose of his property and establish a home with her in Montana. The court should have dismissed the petition on the ground that he was not an innocent but a guilty party.

We approve the action of the court in dismissing the cross-petition. Defendant committed a serious breach of marital duty in going to Millbank and reentering the service of Miller, knowing, as she did, how offensive such conduct would be to her husband whose jealousy already had been aroused. A wife may preserve her chastity and still be guilty of a grave indignity to her husband if she persist in having relations with another man in defiance of her husband's wishes; and the same would be said in the characterization of

similar conduct of the husband towards another woman. This offense of defendant was supplemented by her inexcusable conduct in writing plaintiff shortly after arriving at Millbank that she would not live with him. She did not know at that time that he had entrapped her into signing a post-nuptial contract which purported to divest her of all marital rights in his property.

The case on the merits may be summed up in the statement that both parties being guilty of grave breaches of their respective marital duties neither is entitled to a divorce.

The court erred in overruling defendant's motion for temporary alimony and suit money, since it clearly appears that she was destitute and without means of support, or for the defense of the action or the prosecution of her cross action and that plaintiff has real and personal property of the net value of about $5000.

The contract of separation, even if defendant had understood its contents when she signed it, was against public policy and void, for two reasons, viz., first, it was not made as falsely stated on its face, pursuant to a separation of the parties or in contemplation of an immediate separation, but at a time when they were living together with the avowed intention of continuing to live together as husband and wife, and, second, because the contract was not fair and reasonable, but undertook to divest the wife of all interest in her husband's property of the value of $5000, without giving her a penny in return—even the nominal consideration of one dollar was not paid.

While agreements for separation and for the settlement of property interests between a discordant husband and wife, when fair and reasonable are upheld by the courts, if made in prospect of an immediate separation, such agreements between parties living together amicably and without a present intention to

separate, are held to be against public policy and void, since they have a tendency to promote separation and divorce. [Speck v. Dausman, 7 Mo. App. 165; Roberts v. Hardy, 89 Mo. App. 86; Fisher v. Clopton, 110 Mo. App. 663; Maxwell v. Boyd, 123 Mo. App. 334; Banner v. Banner, 171 S. W. 2, 184 Mo. App. 396.] And where the contract is made after separation or in contemplation of an immediate separation, it will not be enforced unless it be reasonable and fair. [Banner v. Banner, supra.] And it is properly held in the case last cited that as to suit money it will not be enforced if its effect is to deprive a destitute wife of the means of defending the husband's suit for divorce, or of prosecuting an action for divorce against him.

In the contract under consideration the release of defendant's interest in the property of plaintiff and of her rights to support and maintenance had no consideration of any value to support it and the contract was most inequitable and unjust.

Defendant is entitled to a suitable allowance for suit money and alimony *pendente lite.* We would remand the case for a new trial on the merits on the ground that the court in overruling her motion had not given her a fair opportunity to present her side of the case, if it were not for the fact that her own testimony shows she is not entitled to a divorce and in reversing the decree rendered in favor of plaintiff we have given her all the relief on the merits she could possibly be entitled to.

The judgment is reversed and the cause remanded with directions to the court to make a suitable allowance to defendant of suit money and temporary alimony and to dismiss the petition and cross-petition.

All concur.