LORENE VAN KIRK ET AL., RESPONDENTS, v. HUME-SINCLAIR COAL MINING CO. AND CONSOLIDATED UNDERTAKERS, APPELLANTS.—49 S. W. (2d) 631.

Kansas City Court of Appeals. April 4, 1932.

1138

*John A. Hall* for respondent.

*Con Murphy* and *Silvers & Shephard* for appellants.

BLAND, J.—This is an appeal by the employer and the insurer from a judgment of the circuit court affirming an award of the compensation commission, in favor of claimants, who are the wife and minor children of the employee. The commission found that the amount of compensation due was $5,625, for which it made an award in favor of claimants, together with burial expenses in the sum of $150.

The employee, one Veteran Van Kirk, was killed while he was in the employ of the defendant, Hume-Sinclair Mining Company. Defendants, however, contend that his death was not caused by an accident and that the accident, if any, did not arise in the course of or out of the employment.

The facts, which outside of the expert testimony, are undisputed, show that the employer was operating a coal mine in Bates county and that deceased was working thereat in connection with a large steam shovel, weighing 750,000 pounds. The steam shovel was used to remove the earth and rock from the top of a vein of coal which was buried on an average of thirty feet below the surface of the ground. The shovel was located on the top of the vein of coal and was about fifty feet in height and had attached thereto a boom ninety-seven feet in length, which extended out from the steam shovel at an angle of about forty-five degrees. The top of the boom was ninety feet from the ground on which the shovel was located. The shovel was operated by electricity. The power was obtained from a utility having a high tension transmission wire about one-eighth of a mile away. This wire conducted 33,000 volts of electricity. At this point this voltage was reduced to 4500 volts and transmitted therefrom through a cable to the steam shovel. This cable was about

two and one-half or three inches in diameter and was insulated with about one-eighth inch of rubber. There were two switches connected with the cable for the turning on and off of the current. One of these switches was located about one-eighth of a mile from the shovel and the other 500 feet from it. The cable ran to a coil or drum located underneath the shovel which unwound as the work and the shovel progressed eastwardly. From the coil the cable ran westwardly down the pit along the top of the coal to these switches which were on the surface of the ground above the pit. After passing over the coil the cable, at its east end, was attached to a 437 horse power motor. This was an alternating current motor and drove a generator which generated a direct current of electricity, the current coming in to the shovel and motor being an alternating current. The current from the direct current generator supplied the motor that operated the shovel.

The shovel rested upon the vein of coal from which the earth had been removed. After the shovel removed the dirt from the coal the latter was mined and put on cars located on a so-called ''dinky'' track and from there transmitted away. The dinky track was likewise upon the vein of coal. Deceased's duty was to keep this dinky track clear of dirt.

Between eleven and 11:30 A. M., of August 18, 1930, a rain storm came up and some of the men working there sought shelter under the shovel. Deceased went to the oil house which was located in the pit upon the vein of coal and about thirty feet west of the shovel. The oil house was about ten feet square and had a door in the east end and a window in the west end. The rain caused a pool of water to form about the oil house to depth of from four to eight inches. The shovel was located upon four Caterpillar tractors, three of which, by reason of the rain, were in water. There was no water gathered under the shovel itself, but the coal thereunder was wet. The cable ran along the south side of the oil house and about six feet from it and through the pool of water which entirely surrounded the house. The rain storm was a heavy one, lasting from ten to twenty minutes.

One of the workmen, by the name of Meyers, testified that he went to the oil house to get a drink; that it began to rain; that he remained there on account of the storm; that when he went to the oil house deceased was standing in the door facing toward the east; that there was lightning and thunder and immediately thereafter deceased ''jumped up and down, waving his hands and yelled, 'fire, fire, fire' the whole pit is on fire;'' that the witness looked over deceased's shoulder toward the shovel; that he then saw a reflection of fire on the inside of the building; that he then looked out of the window at the back and saw the cable on fire about 200 feet back of the building; that this was from a half to three-fourths of a minute

after he saw the lightning; that the fire on the cable was "about twelve inches big" and was about fifteen feet away from the water and at a place where the cable was swinging in the air about sixteen inches from the coal; that the fire scared him and, knowing that the situation was a dangerous one, he made preparations to get out of the building; that when he went to the door deceased was lying in the water, face down with his head toward the east about six feet east of the door and four feet north thereof and about twenty feet from the dinky track; that when he looked west and saw the blaze deceased was standing "right in the door;" that he walked about ten feet across the building to the door and then saw deceased lying in the water; that at this time he concluded that the water was charged with electricity so he remained in the building; that he saw deceased standing in the door before and after the flash of lightning; that he saw him lying face down in the water outside of the building about a minute after he last saw him alive; that there were no flashes of lighning during said minute; that deceased was lying about sixteen feet from the cable where it ran south of the building.

The witness, Cantwell, testified that he was under the shovel with some other men; that there was a flash of lightning and a heavy bolt of thunder; that fire rolled from under the shovel from the coil; that the "next thing, the man that was working with me said, 'did you feel that,' and we made a run for the dinky track. Q. Did you feel something? A. We sure did;" that he ran about fifteen steps before he saw deceased, who was standing in the door of the oil house; that the witness stopped and deceased "stepped out about three steps, I imagine, into the water. Q. Then what happened? A. Van Kirk looked as if though every step he would take he would bend over like a tree. Q. What direction? A. Forward. Q. Just fell over? A. Yes, sir. Q. You say his body appeared to be stiff as he fell over? A. Just like a tree;" that at this time the witness shouted to Meyers to "look out;" that two men ran for the switches and turned off the current; that when the witness first came from under the shovel he saw fire in the cable about 100 feet or so behind the shovel; that at this time the fire was about as big as a gallon bucket. "Then it ran down the cable before the fire went out until it looked like it was about twenty feet from where it first started. Q. Ran down the cable what direction? A. Towards the shovel;" that the cable ran through the water in which deceased fell; that there was no lightning after he heard the crash of thunder and saw the fire roll out from the coil; that as he ran out from under the shovel he felt "electricity;" that he went out on the dinky track to a point not over ten feet from where deceased was lying; that as he "ran through this water within ten feet" of deceased he received an electric shock, "all I could walk with."

"Q. How far did this fire on the cable progress from the time you ran out from the shovel to the dinky track, and the time you saw VanKirk step out of this door into the water? A. When I came out the fire was as big as a gallon bucket and then it *shorted down into, the water*—looked like about twenty feet of it was on fire —a long place.

"Q. But you stepped out of this water before VanKirk came out of the door? A. Yes, sir.

"Q. And in the meantime the fire or the place you saw the blaze on the cable extended along about twenty feet *down into the water* where VanKirk stepped? A. Yes, sir;" that after he saw one of the men run toward one of the switches, "I waited there until the fire went out on this cable, then me and Mr. Meyers went" to deceased, who was dead.

The witness, Brown, who was also under the shovel, stated that he heard a loud crash and saw fire coming from the drum, coil or spool under the shovel; that he went out on the dinky track on the north side of the shovel about fifteen or twenty feet, then west to the back of the shovel when he saw deceased lying in the water; that he ran to the switch nearest to the shovel; that before he started to pull this switch he saw a small fire upon the cable about a foot and a half high and about 200 feet west of the shovel; that there was more or less water around the shovel, but not as much as around the oil house; that around the shovel it was possibly two or three inches deep but where the coal was higher there was not any; that the water around the oil house was four or five inches in depth; that the water around the shovel was not a continuous area of water, but around the oil house it was a solid mass; that this solid mass of water extended to the cable which was laying on the ground.

The witness, Olson, who was operating the shovel, testified that he saw a flash of lightning and noticed, a jar to the shovel, and the "water fell off the boom and the power went off;" that the alternating current motor was burned out; that he stopped the swinging of the shovel and looked out and saw the motor on fire; that he did not see the lightning hit the boom or the shovel; that his back was turned and he could only see a part of the boom, part of it being behind him.

The evidence further shows that the cable was so badly burned where it was on fire west of the oil house that about twelve inches of it had to be taken out; that "one side of it was bursted out and had been burned black."

The body of deceased was examined by a physician. He found that there were no burns upon it, but that deceased's face was of a blueish color, indicating that he had died as a result of an electric shock. There was no water in the lungs of deceased. There was

nothing else about the body to explain the cause of the death. The doctor testified that he had examined deceased three or four months before his death; that he examined his heart, looked him over generally, found him in very good shape and discovered no indication of heart trouble. There was no autopsy made.

The evidence further shows that three fuses upon the 33,000 volt transmission line were blown out. The expert testimony tends to show that the lightning did not cause this but rather a short some where in the wires or the connections. One of claimants' experts was of the opinion that the cable became shorted in the water surrounding the oil house and that one stepping into the water might be instantly killed; that if there was good insulation upon the cable and the point of contact with the lightning was a few feet away from the water, it could not charge the water; that it all depended upon the insulation; that a bolt of lightning could not strike a body of water and charge it; that electricity being conducted into the water will not charge it like a storage battery is charged but if any one should step into the water and receive a shock it would indicate that there was a charge of electricity going into the water and that this charge of electricity would be discontinued upon the pulling of the switch.

There was testimony on the part of the defendants that the shovel was well grounded by the four Caterpiller tractor wheels, as well as one heavy ground; that the shovel was examined on April 18, 1930, early in the morning, and that it was then in "No. A-1 condition." However, it would appear that the machine was not well grounded or the electricity would not have shorted from the coil to the ground and the motor would not have burned out.

The commission found that deceased was in the oil house presumably seeking shelter from the storm; that "lightning struck this cable at the point where Meyers and the deceased saw it blazing and caused the A. C. motor to be burned out and the current was grounded into the water where deceased stepped from the oil house and the charged body of water caused his death."

Defendants insist that the death of deceased was not occasioned by an accident within the meaning of the compensation act. In this connection it is stated that the death was caused indirectly by lightning, and while, such lightning was an unexpected and unforeseen event, which happened suddenly and violently and without human fault, and produced at the time objective symptoms of an injury, the death resulting from this lightning was not an accident, "because the same was not peculiar to the industry, but was entirely independent and separated therefrom." The reason assigned as to why the death was not occasioned by an accident is so closely connected with another point raised by the defendants, that is, that the death

did not arise out of deceased's employment, the two questions will be discussed together.

It is held that compensation cannot be had when the death or injury of the employee is caused by a thing which one can neither foresee nor prevent and, ordinarily, a death or injury occasioned to a person by lightning, earth-quake, cyclone, tornado or flood, is not compensable. [28 R. C. L. 806, 807.] The rule and exception thereto are well stated in Constr. Co. v. Industrial Com., 309 Ill. 395, 401:

"The general rule in all these cases would seem to be that the employer cannot ordinarily be held liable to pay compensation for injury caused by forces of nature which he cannot reasonably foresee and guard against, where the employee is no more subject to injury from such forces than others, but that the employer is liable where the work or method of doing it exposes the employee to the forces of nature to a greater extent than he would be exposed if not so engaged or to a greater extent than others in the community are exposed."

It was said in Am. Fuel & Clay Products Co. v. Gilbert, 127 So. 540, 541 (Ala.):

"The United States Supreme Court quotes with apparent approval the following from Anderson v. Adamson, 50 Scot. L. R. 855, as a correct statement of this rule: 'If it is the normal risk merely which causes the accident, the answer must be that the accident did not arise out of the employment. But if the position which the workman must necessarily occupy in connection with his work *results in excessive exposure to the common risk . . . or if the continuity or exceptional amount of exposure aggravates the common risk . . .* then it is open to conclude that the accident did not arise out of the common risk, but out of the employment.' Continuing the court says, 'same doctrine has been declared . . . by many of the state courts.'"

The standard for testing each case "is always the same, to-wit, did the employment increase the danger?" [Netherton v. Lightning Del. Co. (Ariz.), 258 Pac. 306, 308.]

There have been many cases before the courts of this country involving the question as to whether a given employment was of such a nature as to expose the employee to a greater hazard from lightning than members of the public generally. The courts all agree upon the rule to be applied, but there is some disagreement as to what facts bring the case within the rule. These disagreements arise almost entirely upon such questions as what courts judicially know concerning the peculiarities of lightning and electricity. Some assume to take judicial notice of these peculiarities and others leave the matter to the testimony produced at the trial of the case.

It was stated in Emmick v. Brick & Ice Co., 201 N. Y. S. 637, 638, 639:

"Knowledge concerning atmospheric electricity is by no means complete, but something is known concerning it, and the court is justified in verifying its information or refreshing its recollection from recognized authorities. [Chiulla De Luca v. Board of Park Com'rs. of City of Hartford, 94. Conn. 7, 107 Atl. 611.] Electrical energy exists in ions in the atmosphere and in drops of vapor in the clouds. This energy is positive or negative, and those energies of opposite signs attract. Generally, or at least often, the electrical energy in the clouds is of the opposite sign to that in the earth. When a cloud containing electrical energy passes sufficiently near, over a hill or a live tree or other object projecting above the earth, the current passes between the cloud and the object on the earth, and the lightning flash occurs. It is known that atmospheric electrical energy acts similarly to electrical energy in a laboratory. It naturally passes through the best conductor. It will pass a greater distance between two copper points than between two iron points. Likewise wet or green timbers are better conductors than dry timbers. A twisted wire cable, or the human body, is a better conductor than a dry timber or board. See Enc. Brittanica (11 Ed.) under subjects 'Lightning' and 'Atmospheric Electricity.' "

It is generally held that because projecting objects may occasion an atmospheric breakdown, trees, tall buildings and other such projections are more likely to be struck by lightning than other less prominent objects. [See Wiggins v. Ins. Acc. Board, 170 Pac. 9, 11 (Mont.), and cases cited.] However, there is a difference of opinion among the courts as to whether or not objects closer to the ground, such as a steel grader, attract lightning (see case last cited).

It was held in the following cases that the injured person was exposed to greater hazards from an act of God than members of the public generally. United States Fid. & Guar. Co. v. Rochester, (Tex.), 281 S. W. 306, where an employee was excavating a pipe line with a steel shovel; Emmick v. Brick & Ice Co., supra, where the employee was working as a carpenter on a shed which had a twisted wire cable looped about its rafters near the back and passing therefrom within a short distance from where the carpenter was working. The case of Am. Fuel & Clay Products Co. v. Gilbert, supra, involved a railroad tipple, in a valley with a hill on each side, composed and constructed with a composition roof, having located on the top thereof a tin sign two feet high and eight feet long and held in place by two guy wires on each side, with one end of each attached to the edge of the roof but no grounded. The employee was injured, immediately under the place where one of said wires was nailed to the roof, by

lightning striking the guy wire and running down the wire to the end, thence through the roof where deceased was employed and killed him. In Mathias v. Ash Grove L. & P. Co., 127 Kan. 93, the employee was killed while walking along a railroad track 300 feet from a high power electric line and telephone line, with other electric lines in the vicinity. A witness saw the lightning strike the high power line and expressed an opinion that the lightning was a little bit more severe than elsewhere and that electric shock were often felt by those riding on the engine on the railroad during thunder storms. There are a number of other cases where the employee took shelter under trees during a storm. [Matter of Madura v. City of N. Y., 238 N. Y. 214; State ex rel. Peoples Coal & L. Co. v. District Court, 129 Minn. 502; De Luca v. Park Commissioners, 94 Conn. 7.]

It is a well known fact that wires conduct electricity and there are many common law cases in which the owners of such wires have been held negligent in failing to have them properly insulated or grounded. In Atl. Coast L. R. R. v. Newton, 118 Va. 222, a railroad company was held liable for failing to provide and maintain, in a proper state of efficiency, lightning arresters in connection with its telephone and telegraph service in order to protect its operators from the danger of lightning or other excessive and dangerous currents of electricity coming in contact with such wires. In that case a telephone and telegraph operator was injured by electricity coming into his office caused by lightning striking a telegraph line. At page 232 of the opinion, the court said: "Electricity is a dangerous agency, and those using it must exercise ordinary care for the protection of their employees from a dangerous current over their wires from any source."

While deceased, in the case at bar, was not employed on the shovel nor in connection with any electrical appliances of the employer, he was employed in close proximity to these things, which were a part of the industry. The evidence shows that they, or one of them, were an agency contributing to a condition making deceased's position more hazardous than that of others in the same community. Deceased, by reason of his employment, was thereby exposed to injury from lightning to a greater degree than other members of the public in general in that locality. Whether the lightning struck the cable, as found by the commission, or the poorly grounded shovel or boom, causing a break down at a weak point in the insulation of the cable where the fire was seen upon it, there is no question but there was ample testimony tending to support the award in this respect.

However, the lighting did not strike deceased and, while it may have contributed to cause his death, it alone could not have brought about this result. In Dunnigan v. Clinton Falls Nursery Co., 155

Minn. 286, an employee, while working in a field operating a harrow, was struck by lightning. He fell face down on the harrow striking his forehead on the top of one of the iron teeth, resulting in the fracture of his skull. He had no burns or marks made by the lightning and there was nothing to indicate that it passed any nearer to him than the point where it struck the horses. It may be assumed that the court in that case would not have held that had the employee been injured solely by a bolt of lightning striking him in an open field, that such would have been anything more than the act of God, unaccompanied with any unusual hazard, but the court said l. c. 289:

"If the lightning was not the sole cause of the injury, if conditions incidental to his employment concurred in producing it, Dunnigan is entitled to compensation. In performing his duties, he was walking in the usual position in close proximity to the harrow with the lines wrapped around his hand. His situation was such that a fall from any cause was likely to bring him in contact with the harrow. He may have been shocked and dazed by the lightning, yet his injury was caused by striking his head on the top of the harrow tooth. We cannot say that he would have been equally exposed to the same danger apart from his employment."

In the case at bar the lightning, together with the cable charged with the high voltage of electricity, combined to produce the death of the employee. The lightning was not the sole cause of the casualty, but the highly charged cable was, at least, an incidental cause. We think there is no question but that deceased was exposed to more than ordinary hazards, under the circumstances. In fact it would appear to us that it would make no difference what agency caused the short in the wire from which the charge of electricity escaped causing the death, as the presence of the electrically charged cable, which contributed to his death, was peculiar to deceased's employment.

We have examined the cases cited by defendants and find them not in point. We have already alluded to the case of Wiggins v. Ins. Acc. Board, supra, cited by defendants. In the case of Stone v. Blackmer & Post Line Co., 27 S. W. (2d) 459, the employee was struck by a tall smoke stack in the path of a tornado. The smoke stack was upon the premises of the employer and was blown down, resulting in the employee's injury. The smoke stack had nothing to do with the presence of the wind, while, in the case at bar, there was a perfect "set up" to conduct the electricity to the place where deceased was killed. The court said l. c. 460, that to hold that the mere fact that the smoke stack was there exposed to the elements would not sustain a finding against the employer; "that would amount to stating that because the business of an employer is located in a building adjacent to a sound but much higher one, he would

be held to compensation if a tornado should precipitate a part of the taller building upon his place and injure his employees.'' We see no similarity between the Stone case and the case at bar.

It is claimed that the death of deceased did not arise in the course of his employment. In support of this defendants cite section 3305 (c), Revised Statutes 1929, which reads as follows:

. ''Without otherwise affecting either the meaning or interpretation of the abridged clause 'personal injuries out of and in the course of such employment,' it is hereby declared not to cover workmen except while engaged in, or about the premises where their duties are being performed, or where their services require their presence as a part of such services.''

Defendants do not attack the finding of the commission that deceased went to the oil house presumably to seek shelter from the storm,'' but state that no part of deceased's duties called him there, but his going there was merely a voluntary act; that his death was caused while he was away from his place of employment and had he remained at the dinky track where his services required his presence, he would not have been killed.

Without going into an extended discussion of this matter or of the words ''in the course of his employment,'' it is apparent that there is no merit in the contention. This can be readily seen by an examination of the following authorities: De Luca v. Park Com'rs. supra; St. Road Con. v. Ind. Com. (Utah), 190 Pac. 544; Matter of Madura v. City of N. Y., supra; Howes v. Stark Bros., 223 Mo. App. 793; Conklin v. K. C. P. S. Co., 41 S. W. (2d) 608. When plaintiff was killed he was leaving the oil house, in other words, the place where he sought shelter, but no point is made in reference to this matter. What he was actually doing or intended to do is not shown by the evidence. It may have been that he was actuated by fear and was attempting to escape from the electricity in the vicinity. Of course, if this were true, it would not change the situation, nor the rules of law applicable thereto.

We have examined the case of Smith v. Levis-Zukoski Merc. Co., 14 S. W. (2d) 470, cited by defendants and find it not in point. In that case the claimant did not sustain the burden upon her because she did not show what deceased was doing when he fell into the elevator shaft, that is, she failed to show that there was any connection between his employment and the fall.

However, it is said that the way in which it is claimed that deceased was killed is contrary to the physical facts; that the theory that the water was charged with electricity is entirely untenable for the reason that as soon as the current escaped from the cable to the water it would be immediately dissipated into the earth. While the commission found that the water was charged with a current

of electricity escaping from the cable, we do not think that this finding is to be considered in the light of a finding that the water was charged in the sense that a battery is charged, or any material that is so insulated that electricity cannot escape therefrom. The evidence shows that this water could not have been charged by the escaping electricity in the sense that a battery is charged and no doubt the commission did not use the word "charged" in that sense, but in the sense that persons often refer to a wire carrying electricity, as charged. The evidence merely shows water to be a conductor of electricity and that it might run through the water present and thereafter escape into the earth. Electrical phenomena are not fully understood by scientists, and we would not be justified in saying that, as a matter of law, deceased was not killed by the current of electricity passing through the water. We do know that water is an excellent conductor of electricity. As was said by this court in the case of Wollums v. Mutual Benefit Health & Accident Association, 46 S. W. (2d) 259, 268: "The peculiar characteristics of electricity are not thoroughly understood at this time. Often some strange and inexplicable things occur in reference to it and its results and we do not think that the jury were required to accept the testimony of experts in this instance, in face of testimony of lay witnesses of what occurred, which plainly contradicts the expert testimony." In the case at bar we have expert testimony that a current of electricity could pass through a body of water of this kind. There is nothing in the record suggesting that deceased could have met his death by any other means. He was not struck by lightning as he was seen alive in the door of the oil house after the lightning ceased. The evidence shows that he was thirty-five years of age; that the condition of his heart was good; that he was in full possession of his faculties and apparently a healthy man until the instant of his death, when he fell into the water in a manner evidencing that he had received a sudden shock. Other employees received electric shocks at the time and one of them waded in the water to a point about ten feet from where deceased was lying dead. This witness said that the shock was so strong that it was "all I could walk with." Under all of the circumstances, we are not in a position to disagree with the finding of the commission, for to so do, we would be required to hold, as a matter of law, that deceased did not receive an electric shock in the manner it is claimed. The judgment is affirmed. All concur.