VELMA BUHRKUHL, DEPENDENT OF THOMAS BUHRKUHL, DECEASED EMPLOYEE, APPELLANT, v. F. T. O'DELL CONSTRUCTION COMPANY, EMPLOYER, AND THE FIDELITY & CASUALTY COMPANY OF NEW YORK, INSURER, RESPONDENTS.—95 S. W. (2d) 843.

St. Louis Court of Appeals. Opinion filed July 7, 1936.

Respondents' Motion for Rehearing Overruled July 20, 1936.

Writ of Certiorari Quashed by the Supreme Court, May 5, 1937.

*George A. Hodgman* and *Luke & Cunliff* for respondents.

968

*Roy Hamlin* for appellant.

BENNICK, C.—This is a proceeding by Velma Buhrkuhl, the totally dependent widow of Thomas Buhrkuhl, to recover the death benefit provided by the Workmen's Compensation Act (Secs. 3299-3376, R. S. 1929; Mo. St. Ann., secs. 3299-3376, pp. 8229-8294). The F. T. O'Dell Construction Company is the employer, and the Fidelity & Casualty Company of New York the insurer.

Buhrkuhl was killed as the result of being struck by lightning on August 11, 1932; and the issue before the commission was that of whether his death was by accident arising out of and in the course of his employment, or whether instead it came about as the result of an act of God operating wholly independently of his employment.

The award of the commission, with one member dissenting, was in favor of the dependent, and against the employer and insurer, for a sum well within our jurisdiction. The latter thereupon appealed to the circuit court, wherein a judgment was entered reversing and setting the award aside. From such judgment the dependent's appeal to this court has been perfected by the proper steps.

The ultimate question for our decision is whether there was sufficient competent evidence adduced to have supported the award in favor of the dependent.

The deceased was employed on a construction job on a road which ran from the town of Center, in Ralls County, Missouri, to a point known as Asher's Ford. His work was to move and wheel dirt with a team and a metal slip or scoop. There were all told some eight or nine men employed on the particular project, a majority of whom were farmers residing in the immediate neighborhood, but who accepted work on the highway from the employer and furnished their own teams on the job.

At the time in question the work was being carried on in the vicinity of the farm of Monroe Asher, and in fact at a point where the right of way for the road ran within seven feet of the corner of Asher's barn. During the two weeks that the work had been in progress the Asher place had been looked upon as a "sort of headquarters" for the construction project. Those of the men, including the foreman, who did not live in the neighborhood, customarily ate and slept in Asher's house; all the men watered their teams at a well in his barn lot; and on two occasions at least when rains came up during the working hours, they and their teams were shown to have taken shelter in his barn or outbuildings.

Shortly after the lunch hour on August 11, 1932, a heavy storm came up accompanied by a great amount of rain, lightning, thunder, and wind. Inasmuch as the force of the storm was evidently too great for work to be done during its progress, the foreman told his men to "go on and unhitch and hunt your shelter," whereupon they did unhitch their teams and at once proceeded to take shelter in Asher's barn and other outbuildings as they had done under similar circumstances on the day before. It appears that the Asher barn and outbuildings constituted the only available shelter in the neighborhood, and it is a significant fact that on both days the foreman accompanied his men inside to seek protection from the elements. The significance of all this is that while there is no claim that the foreman told his men in so many words that they should take shelter on the Asher premises, yet it was so understood by all of them when he gave the order, and the legal situation is therefore the same as though the foreman had specifically told the deceased to go into the barn where he was when he was killed.

It is also a material fact upon the issue of whether the accident might be said to have occurred during the course of the employment that when the men were told to unhitch and hunt shelter, they were not dismissed from their employment for the day, but were expected to leave their shelter and return to their respective duties as soon as the rain should cease falling.

Upon the order to unhitch, some few of the men took shelter in a granary or shed, but four of them, including the deceased and the foreman, went inside the barn with their teams to await the end of the storm. The testimony shows that aside from the four men, there were sixteen horses inside the barn, in which, in addition, Asher was housing a tractor and a plow. It appears also that the barn had the usual loft in which some 660 bales of hay were stored.

Whatever may have been its importance upon the question of her right to compensation, the dependent undertook to lay considerable stress on the fact that the men and horses were closely crowded together in the barn, and that both men and horses were dripping wet from the rain. At any rate, while huddled together in the barn in such a fashion, a bolt of lightning struck the barn killing the deceased and six of the horses, but fortunately inflicting no substantial injury upon any other man or beast. The tractor was not damaged by the lightning, and was removed from the barn before the same was burned to the ground. The plow, however, had apparently been struck by the lightning, and was burned beyond all recognition.

So far as the lay of the land is concerned, the Asher place is in the open country, with the nearest hill an eighth of a mile away, and the nearest woods a mile distant. In the immediate vicinity, in addition to the barn in which the deceased was killed, there was the farmhouse, together with a shed or granary. There was evidence

to show that the three buildings in question sat upon ground which was slightly elevated about the surrounding terrain, and that the barn, which was about 25 feet in height, was the tallest of the three buildings in the group. It was also shown that while the storm was quite a general one, with flashes of lightning in evidence in all directions, yet the Asher barn was the only object struck during the storm for many miles around.

The dependent predicates her right to compensation upon the theory that the act of the deceased in seeking shelter from the storm (and particularly so at his foreman's direction), did not serve to interrupt the course of his employment, and that his death by being struck by lightning was by accident arising out of his employment, inasmuch as his presence in the barn, under all the circumstances shown in evidence, intensified and magnified the risk to which he was subjected from the danger of the elements over and above that to which he would otherwise have reasonably been exposed but for his employment. This is indeed a generally recognized doctrine of the law of compensation, and if it may be said that there was sufficient competent evidence adduced to warrant the belief that the employment of the deceased did result in his excessive exposure to the common risk from lightning, then the award of the commission in favor of the dependent should obviously be affirmed. [Van Kirk v. Hume-Sinclair Coal Mining Co., 226 Mo. App. 1137, 49 S. W. (2d) 631.]

To this the employer and insurer counter with the suggestion that the stroke of lightning which killed the deceased was a danger common to the neighborhood and in no sense peculiar to the employment, and that the death of the deceased was therefore the direct result of an act of God so as to exclude the dependent's right to compensation therefor.

As regards the question of the legal sufficiency of such a defense, it suffices to say that the defense of act of God applies no less to a compensation case than to the ordinary action at common law for damages, which is to say in this case, as we have indeed already pointed out, that if the death of the deceased was attributable solely to the injurious effects of the forces of nature unmixed with any peculiar risk to which the employment gave rise, then there could be no liability to the dependent for compensation, but that if the employment of the deceased did subject him to a risk and hazard from such forces of nature over and above that to which the general public was exposed, or, to put it another way, if the act of God concurred and collaborated with conditions peculiarly attendant upon the employment to bring about the death, then the dependent is clearly entitled to recover the death benefit as against the defense here interposed. [Brooks v. Greenberg (Mo. App.), 67 S. W. (2d) 823.]

As we understand the case, the fact that the accident at least occurred in the course of the employment of the deceased does not appear to be seriously disputed, if in fact it is disputed at all. The matter of seeking shelter from the fury of the storm was one essential to the personal comforts and necessities of the deceased while generally engaged at his employment, and is therefore to be deemed incidental to the employment and not of such a character as to have broken or interrupted the continuity of the same. [Consolidated Pipe Line Co. v. Mahon, 152 Okla. 72, 3 Pac. (2d) 844; Van Kirk v. Hume Sinclair Coal Mining Co., *supra*; Gillmore v. Ring Construction Co., 227 Mo. App. 1217, 61 S. W. (2d) 764.]

So the decisive question in the case is that of whether the death of the deceased was by accident arising out of his employment, depending, of course, upon whether or not there was sufficient competent evidence to show that his employment had brought about an excessive exposure to the lightning which killed him. Of this we think there can be no serious doubt.

Here the trouble arises purely over the question of out right to take judicial notice of the fact, if it is a fact, that the barn in which the deceased took shelter was, by reason of its location and construction, an object of such a character as to render it more likely to be struck by lightning than the ordinary object in that vicinity. We say the question is one of judicial notice, and so it is, since the dependent introduced not a word of expert evidence regarding the characteristics and propensities of lightning or atmospheric electricity, depending wholly instead upon certain magazine articles dealing with the subject, which were introduced in evidence at the close of the hearing before the referee, but which, upon objection by the employer and insurer, were stricken from the record upon the review before the full commission.

Now the doctrine of judicial notice is not a hard and fast one, but is modified by a judicial discretion which leaves it generally to the court to determine for itself whether it shall exercise the power in a given instance, depending primarily upon the nature of the subject, the issues involved, and the apparent justice of the case. Nor, if the court elects to exercise its prerogative of taking judicial notice of a fact material to the issues, is it in all events limited to a matter actually within the personal knowledge of the judge. To the contrary, it may take judicial notice of any and all facts which are a part of the general knowledge of the country, and which are generally known and accepted and have been duly authenticated in repositories of fact open to all, and especially so of facts of official, scientific, or historical character as the same may be set down and recorded in encyclopedias, dictionaries, and the like to which the court may turn to verify its information or refresh its recollection. [City of St. Louis v. Niehaus, 236 Mo. 8, 17, 139 S. W. 450; Con-

solidated Pipe Line Co. v. Mahon, *supra;* Van Kirk v. Hume-Sinclair Coal Mining Co., *supra;* 23 C. J., 169.]

Of course no court would be so bold as to assume to take judicial notice of all the varied manifestations of electricity, whether atmospheric or otherwise, but there are nevertheless certain facts and peculiarities about it which are definitely accepted and well recognized. For instance, in Vol. 17, The Encyclopedia Americana, pp. 432-434, where the subject discussed is that of "Lightning and Lightning-rods," the text makes note of the fact that fatalities from lightning are everywhere increased by the tendency of persons to seek shelter in or under objects such as barns, trees, and the like; that isolated buildings, as in the case of farm buildings, are in five times as great danger from lightning as buildings grouped together in city blocks; that because of their comparative isolation, farm buildings are generally regarded as a poor insurance risk; that in the matter of statistics, barns seem to be a peculiar object of the destructive force of lightning; and that the highest point in a building or group of buildings is the most obvious target for the lightning's stroke.

Bearing in mind the facts of this case regarding the isolated character of the Asher buildings and the superior height of the barn as compared with that of the shed and farmhouse, and considering those facts in the light of what is known about the common characteristics of lightning, it is at once evident, we think, that when the deceased took shelter in the barn, he became exposed to a risk and danger from lightning greater than that confronting the neighborhood generally. Such, incidentally, was the conclusion reached by the Supreme Court of Oklahoma in Consolidated Pipe Line Co. v. Mahon, *supra*, in which the facts, though quite similar in many particulars to those in the case at bar, were actually not as favorable to the dependent's right to recover compensation upon the theory of the occurrence of a compensable accident.

It follows that the judgment of the circuit court should be reversed and the cause remanded with directions to the circuit court to enter up a new judgment affirming the award of the commission. The Commissioner so recommends.

PER CURIAM:—The foregoing opinion of BENNICK, C., is adopted as the opinion of the court.

The judgment of the circuit court is, accordingly reversed and the cause remanded with directions in accordance with the recommendations of the Commissioner. *Hostetter, P. J.,* and *Becker, J.,* concur; *McCullen, J.,* absent.