**Linda Margaret CARR, Plaintiff–Respondent,**

v.

**Melvin L. GRIMES, Defendant–Appellant.**

No. 17817.

Missouri Court of Appeals,
Southern District,
Division One.

March 17, 1993.

Motion for Rehearing or Transfer
Denied April 8, 1993.

Peggy S. Hedrick, Springfield, for defendant-appellant.

Mark E. Fitzsimmons, Kenneth P. Reynolds, Fitzsimmons, Schroeder & Nelson, Springfield, for plaintiff-respondent.

PER CURIAM.

The respondent Linda Margaret Carr (mother) brought this action to determine if the appellant Melvin L. Grimes is the biological father of Winston David Grimes, born April 2, 1985, to the mother. A jury returned a verdict in favor of the mother on the issue of paternity. Following a separate trial to the court on the remaining issues raised by the mother's petition, the trial court ordered the appellant to pay to the mother prescribed sums for medical expenses, attorney fees, and back and future child support.

By his first two points relied on, the appellant challenges the admission into evidence of the videotaped deposition testimony of two experts, Dr. Cross and Dr. Bias, and various exhibits from those depositions. The appellant's Point III argument is that the trial court erred in not taking judicial notice of the human gestation period of 280 days and in not requiring the mother to prove deviation from that 280-day period. In Point IV the appellant complains that the trial court erred when it failed to declare a requested mistrial because a previously admitted exhibit remained on display before the jury while the mother testified.

For reasons to be discussed, we reject the appellant's points on appeal, and we affirm the judgment of the trial court.

### FACTS

We begin with facts that support the jury's verdict. The appellant, an ordained minister, was serving as pastor of a church in Springfield, Missouri, when he met the mother.

The mother testified that on July 15, 1984, she and her sister visited with the appellant at his church. The appellant then visited the mother at her home on July 16, followed by a second visit there on July 17. During the July 17 visit the appellant and the mother "began to get romantic" and went to the bedroom and had sexual intercourse.

Around August 1 the mother, who was accustomed to regular menstrual periods, missed a period and suspected she was pregnant. She visited a clinic where she received confirmation of her pregnancy. A day or two later, when she told the appellant, he did not deny paternity but told her he wanted her to get an abortion. When she told him she would not, "he told me he would do all he could to get me through it and that he would be my strength and that he wasn't going to run from me." The

mother testified she had no sexual relations from March 1, 1984, until her intercourse with the appellant on July 17.

The mother and the appellant continued to see one another, and they discussed marriage plans, which never materialized. Eventually the mother broke off the relationship. On April 2, 1985, eight days prior to her April 10 due date, the mother gave birth by cesarian section to an 8-pound male whom she named Winston David Grimes. The appellant never visited the infant at the hospital and paid no medical expenses related to his birth. On April 25, 1985, the mother filed suit alleging the appellant was the child's father and seeking child support, reimbursement of medical expenses, and attorney fees.

One of the mother's older sons testified that he met the appellant at the mother's home in December 1984, and that he saw him there on one other occasion. One of the mother's neighbors identified the appellant in court as a man she had seen at the mother's home on three occasions; on two of those occasions he was driving the church van.

The appellant testified that the mother visited his church in July 1984 at which time she and her sister asked him to speak at their church. He said he never went to the mother's home and he denied having had sexual intercourse with her. Summarized, his testimony and that of other defense witnesses directly conflicted with the evidence offered by the mother concerning their relationship.

On October 7, 1986, blood samples were drawn from the mother, the appellant, and Winston at St. John's Hospital in Springfield for use in a paternity exclusion study. The samples were sent to Midwest Organ Bank, Inc., where HLA testing—so called tissue typing tests—as well as certain red blood cell tests [1] were performed. Additional testing that could not be done by Midwest—testing of red blood cell enzymes and serum proteins—was performed at the immunogenetics laboratory of The Johns Hopkins University School of Medicine.

Over the objection of the appellant, the jury was shown the videotaped depositions of Dr. Donald E. Cross, medical director of Midwest's histocompatibility laboratory at the time the tests were conducted, and Dr. Wilma Bias, director of The Johns Hopkins laboratory, concerning the blood testing and their respective reports.

Following the showing of the Cross deposition, the mother offered into evidence 18 exhibits, most of which were Cross deposition exhibits. In response, the appellant renewed earlier written objections to certain test results and other deposition exhibits. When those objections were overruled, the appellant objected on the basis of a lack of foundation to the admission of any Cross deposition exhibits that incorporated the findings of Dr. Bias until after the Bias deposition was shown.

The appellant then moved for the admission of two Cross deposition exhibits, number 22, describing it as "the letter that [Cross] wrote to the attorneys on October 15th saying that he—based on his testing, he could not reach a substantial, statistical, significant result," and number 21, a paternity testing book that Cross, in his deposition, identified as authoritative and then read from. Counsel for the appellant continued:

The only exhibits which I believe need to be offered after the testimony of Dr. Bias are [Cross] Deposition Exhibit 2, which is Plaintiff's Exhibit 2; [Cross] Deposition Exhibit 4, and [Cross] Deposition Exhibit 16. Those I will have no objection to after the deposition of Dr. Bias.

The others I have no objection to except for the fact that I think all of the documents referred to by Dr. Cross, including Deposition Exhibits 21 and 22 should be admitted in evidence.

When the trial court learned the attorneys had not waived a foundation for the Cross deposition exhibits, he rejected all of the exhibits offered by the mother.

After the Bias deposition was shown to the jury, the mother offered 33 exhibits, including the Cross deposition exhibits ear-

---

**1.** The red blood cell tests performed were ABO, Rh, MN and S, Kell, Duffy, and Kidd.

lier offered. The mother included in her offer Cross deposition exhibit 22, the October 15 letter.

When the court inquired of the mother's lawyer if his offer included the Cross deposition exhibits that the appellant wanted in evidence, he responded, "I believe so." The appellant's lawyer then said, "I have nothing further and I—I will stipulate they can be admitted." The court then stated, "The offers from the plaintiff are received into evidence."

Many of the deposition exhibits are not before this court, but from what was filed and from the record we can glean that the exhibits included the results of the HLA, red blood cell, red blood cell enzyme, and serum protein analyses. They also included paternity test reports in which statistical calculations made by the two laboratories were recorded. The statistical calculations were paternity indexes [2] of 417 to 1 and 90 to 1 and plausibility of paternity [3] percentages for the appellant of 99.8% and 98.9%.

Among the defense witnesses called was Dr. Melvin Foster, a college professor who held an advanced degree in mathematics and a Ph.D. in statistics. He characterized the mother's test reports as unacceptable in the scientific community of statisticians and mathematicians because of the absence in the reports of any indication of "variability" in the figures used and any indication that the observations reported were independent, that is, that one did not influence the other. He also characterized the ratio calculation found in the reports as "misleading."

One of the Cross deposition exhibits admitted into evidence was a letter from Dr. Bias to Dr. Cross, which read:

Dear Dr. Cross

Enclosed is a second report on the Grimes/Carr paternity case with the addition of Gm and Km, the immunoglobulin allotypes. These systems do not exclude Mr. Grimes, but rather raise the likelihood ratio to 417:1 (99.8%), using the HLA frequencies from *Histocompatibility Testing 1980*, or to 90:1 (98.9%) using the UCLA frequencies. Both these likelihoods leave no reasonable doubt that Mr. Grimes is the father of Winston Grimes.

Sincerely yours,

/s/ Wilma B. Bias

Wilma B. Bias, Ph.D.

Professor of Medicine

Division of Medical Genetics

An enlargement of the letter was displayed to the jury and was not removed when the mother began her testimony. As the appellant's lawyer prepared to cross-examine the mother, she became aware of the enlargement and requested a mistrial, which the court denied.

The appellant asked the trial court to judicially notice a 280–day human gestation period "and a range of 38 to 42 weeks." The court refused to notice "a specific number of days" but permitted the appellant's attorney to refer in closing argument to the 38- to 42–week range.

The jury found the appellant to be the father. Following a separate trial on the issues of child support, medical expenses, and attorney fees, the trial court entered judgment. The appellant brings this appeal challenging the finding of paternity.

## DISCUSSION AND DECISION

*Points I & II: Admissibility of Expert Testimony*

■ The appellant challenges the entire testimony of Dr. Cross and Dr. Bias in

---

**2.** Dr. Cross explained his use of *paternity index* to mean "a simple ratio that the frequency the alleged father can give to a child the necessary genetic material, as opposed to the frequency that a random man can give the necessary genetic material." He explained that two dissimilar paternity indexes were calculable in this case because the random-man frequency figure used in the equation depended upon the frequency table used. Thus, a 417 to 1 ratio was obtained when using the tables in a publication entitled *Histocompatibility Testing 1980*. A 90 to 1 calculation resulted from the use of frequency

tables derived from a study done by Dr. Paul Terasaki at the University of California–Los Angeles.

**3.** Dr. Cross testified that *plausibility of paternity* is "another calculation that is in common usage in paternity testing." As he used it, the term is the percentage calculated when the figures used in determining *paternity index* are plugged into a derivation of the Bayes theorem called the Essen–Moller equation.

Points I and II of a brief that contains a "Statement of Facts" that is wholly devoid of *any* facts relevant to the testimony of the two experts. The *only* mention of their testimony in his statement of facts is in connection with a *previous trial,* a trial that ended when a jury could not reach a verdict. Quoting fully from his "Statement of Facts" insofar as it relates to the deposition testimony of Drs. Cross and Bias:

> No blood test was conducted on Mr. Smith [the mother's former husband].
>
> . . . .
>
> The blood tests had been taken before the 1989 trial [at which the jury was unable to reach a verdict], and the reports were available for trial, but the depositions of Petitioner's expert witnesses, Drs. Cross and Bias had not been taken. Appellant made substantially the same objections to the reports as are submitted to this court, based upon the statistical computations. Appellant's expert witness, Dr. Melvin Foster, was not allowed to testify because the Court determined that the reports themselves did not reflect conclusions of Dr. Cross as to statistics. An offer of proof was made out of the jury's hearing, and was rejected by the Court.

The appellant's statement of facts is so inadequate that we decline to consider the allegations of error presented by Points I and II. *See State ex rel. Missouri Hwy. & Transp. Comm'n. v. Pipkin,* 818 S.W.2d 688 (Mo.App.1991).

"[A]llegations of error ... not properly briefed shall not be considered in any civil appeal...." Rule 84.13(a). Rule 84.04(a), governing the contents of an appellant's brief, provides:

> The brief for appellant shall contain: (1) A concise statement of the grounds on which jurisdiction of the review court is invoked; (2) A statement of the facts; (3) The points relied upon; and (4) An argument which shall substantially follow the order of "Points Relied On."

Rule 84.04(c) provides:

> The statement of facts shall be a fair and concise statement of the facts relevant to the questions presented for determination without argument.

For the "questions presented for determination" we look to the appellant's first two points relied on, which we set out in their entirety:

> I. The court erred, and abused its discretion in admitting the testimony of Drs. Cross and Bias, in that it was inadmissible hearsay and did not comply with the foundation requirements of the business records exception or any other exception to the hearsay rule.
>
> II. The court erred and abused its discretion in overruling defendant's motion to suppress, and in refusing to strike testimony regarding the statistical computations and their results, including related testimony regarding "likelihood of paternity," and "frequency of occurrence," in that:
>
> > A. There was insufficient foundation for the admission of Drs. Cross and Bias testimony as expert witnesses in the areas of mathematics and/or statistics, and the statistical aspects of the report did not qualify under the Frye test, as admissible in the scientific community of statisticians.
> >
> > B. By submitting the testimony of Drs. Cross and Bias without a proper finding as to the nongenetic elements on which the 50% prior probability was based, the jury was not confined to factual issues, but left to speculate as to the basis of the 50% prior probability, on which the calculation of the "likelihood of paternity" was based.
> >
> > C. The calculations based upon the blood test were not reliable, and submitting figures to the jury based upon application of a 50% prior probability that appellant was the father of Carr's child was manifestly unfair, misled the jury, and set the stage for a decision based upon passion and prejudice rather than objective consideration of the evidence.

It is "immediately apparent and patently plain" that the appellant's statement of facts, insofar as it purports to relate to Points I and II, is devoid of *any facts*

concerning the testimony of Drs. Cross and Bias as adduced in this trial. At most, it is nothing more than "a thumbnail sketch" of a general objection made to the admission of the reports—not the testimony—of Drs. Cross and Bias at an *earlier trial.* The statement of facts "does not purport to state, summarize or even allude to any of the *testimony or evidence* supporting or bearing upon" the appellant's first two points relied on. *Pipkin,* 818 S.W.2d at 689 (quoting *Midwest Lumber Co. v. Sellers,* 556 S.W.2d 509, 510 (Mo.App.1977) (emphasis in *Midwest Lumber* )). "To denominate the segment of [the appellant's] brief under consideration as a 'Statement of Facts' [bearing on the issues raised in Points I and II] within the contemplation and meaning of Rule 84.04(c) would be farcical." *Pipkin,* 818 S.W.2d at 689 (quoting *Midwest Lumber,* 556 S.W.2d at 511).

In the past we have been hesitant to dismiss an appeal because the appellant's statement of facts was inadequate, despite authority to do so. *Thompson v. Thompson,* 786 S.W.2d 891, 892 (Mo.App.1990). We are equally reluctant to refuse to consider allegations of error that are not properly briefed even though Rule 84.13(a) clearly mandates that "allegations of error ... not properly briefed shall not be considered in any civil appeal." *Pipkin,* 818 S.W.2d at 689.

Because of our reluctance to rigorously apply Rule 84.13(a) to Points I and II of the appellant's brief, we look to the argument portion of the brief pertaining to those points. *See Pipkin,* 818 S.W.2d at 689; *Salamy v. State Farm Fire and Casualty Co.,* 629 S.W.2d 653, 655[2] (Mo.App.1982). We find in the Point I argument little that could be characterized as relevant "facts." Although the transcript of Dr. Cross's deposition testimony spans 110 pages, the appellant's Point I argument contains only three page citations as called for by Rule 84.04(h). Two of those page citations purportedly identify Dr. Cross's testimony that his laboratory " 'relies on [Dr. Terasaki's] work in compiling samples....' " We find no such testimony at those pages in Dr. Cross's deposition transcript. Rather, we find Dr. Cross's testimony that Midwest

laboratory used frequency tables, compiled by Dr. Terasaki, that are "considered authoritative in the area of histocompatibility testing" and are "accepted in the community of blood testing doctors."

The argument portion of the appellant's brief under Point I contains no citation to the transcript of the deposition of Dr. Bias.

In the argument under Point II relevant facts appear, some—but not all—of which have appropriate page citations. However, the facts in the Point II argument are so selectively presented that they cannot be said to constitute a "fair" statement of the facts as required by Rule 84.04(c). Omitted are numerous facts taken from the various exhibits, facts essential to a "fair" statement because the exhibits are in evidence without objection and they provide a foundation for the testimony of Drs. Cross and Bias.

Examples of omitted facts include the following testimony by Dr. Cross: his explanation of the principles of paternity testing by the use of blood testing and his experience in the field (more than 4,000 cases); his description of the blood tests that were performed in this case, tests said by him to be considered reliable in the scientific community; his explanation of how the genetic markers in this case compared to the frequency of genetic markers for a random, unrelated man of the same race, a calculation that yielded a statistical result called "paternity indexes"; how by his use of the Terasaki tables of frequency and the blood test results in this case, the paternity index relating to the appellant was 90 to 1; his description of his use of a derivation of the Bayes theorem called the Essen–Moller equation to arrive at "plausibility of paternity" for the appellant of 98.9%; and that upon completion of all blood testing, the "paternity index" calculated for the appellant achieved sufficient statistical significance for him to state, with a reasonable degree of medical certainty, that the appellant was the biological father of Winston.

■ The primary purpose of the statement of facts is "to afford an immediate,

accurate, complete and unbiased understanding of the facts of the case...." *Wipfler v. Basler*, 250 S.W.2d 982, 984[3] (Mo.1952) (applying predecessor Rule 1.08). *See also Pioneer Finance Co. v. Washington*, 419 S.W.2d 466, 468 (Mo.App.1967) (applying predecessor Rule 83.05), and *Porter's Ready–Built, Inc. v. Plummer*, 685 S.W.2d 236, 237 (Mo.App.1985).

An accurate and fair recital of the facts is equally important in the argument portion of the brief, and that importance is underscored where, as here, we have disregarded a failure to comply with Rule 84.-04(c) and have turned to the argument to obtain an understanding of the facts of the case. *Pipkin*, 818 S.W.2d at 690. The complexity of the issues raised in the appellant's Point II emphasizes the need for "an immediate, accurate, complete, and unbiased understanding of the facts relevant to those issues." *State ex rel. Webster v. Missouri Resource Recovery, Inc.*, 825 S.W.2d 916, 937 (Mo.App.1992). We do not obtain an understanding of the facts relevant to Points I and II from the appellant's statement of facts or from the argument portion of the appellant's brief under Points I and II.

We do not expect perfection; however, we do expect reasonable compliance with the briefing rules. *Pipkin*, 818 S.W.2d at 690.

> [I]t is not the duty of an appellate court to become an advocate for the appellant and search the record for error; the judgment rendered is presumptively correct and the appellant has the burden to demonstrate that it is erroneous. If the court is to adjudicate the appeal without becoming an advocate for the appellant, the appellant must define the scope of the controversy by stating the relevant facts fairly and concisely.

*Pipkin*, 818 S.W.2d at 690 (quoting *Thompson*, 786 S.W.2d at 892) (citations in *Thompson* omitted).

We reject Points I and II without adjudication of the merits. Rule 84.13(a) authorizes this disposition. *See also Pipkin*, 818 S.W.2d at 690; *Thompson*, 786 S.W.2d at 891.

*Point III: Proof of Human Gestation Period*

In Point III the appellant complains that the trial court erred in refusing to take judicial notice of the human gestation period of 280 days and in failing to require the mother "to put forth affirmative proof of a deviation from said period." As a result, he argues, the burden of proof was unfairly shifted to him, and the jury was misled and left to reach a decision based on "speculation, passion, and prejudice."

The term *judicial notice* is broadly used to denote "both judicial knowledge (which courts possess) and common knowledge (which every informed individual possesses); and matters of common knowledge may be declared applicable to the case without proof." *Bone v. General Motors Corp.*, 322 S.W.2d 916, 924[9] (Mo.1959). "[T]he doctrine of judicial notice is not a hard and fast one, but is modified by a judicial discretion which leaves it generally to the court to determine for itself whether it shall exercise the power in a given instance, depending primarily upon the nature of the subject, the issues involved, and the apparent justice of the case." *Buhrkuhl v. F.T. O'Dell Const. Co.*, 232 Mo.App. 967, 95 S.W.2d 843, 846[6] (1936), *cert. quashed, State ex rel. F.T. O'Dell Const. Co. v. Hostetter*, 340 Mo. 1155, 104 S.W.2d 671 (1937). Elsewhere it has been said that judicial notice is a doctrine "which must be tempered by judicial discretion, the Court not being bound to take judicial notice of matters of fact," *Schilling v. Bi-State Development Agency*, 414 S.W.2d 818, 826[14] (Mo.App.1967), and "[i]f there is doubt about the notoriety of a fact, judicial recognition of it must be declined." *Gordon v. Gordon*, 739 S.W.2d 728, 730[1] (Mo.App.1987).

Here, the appellant asked the trial court to judicially notice a 280–day human gestation period "and a range of 38 to 42 weeks." The court refused to notice "a specific number of days" but permitted the appellant's attorney to refer in closing argument to the 38- to 42-week range. Ap-

pellant now argues the refusal to notice the 280–day period was error.

There is ample authority that a court—trial or appellate—may judicially notice a 280–day human gestation period. *See West's Missouri Digest 2d* "Evidence" Key No. 14 and "Children Out–Of–Wedlock" Key Nos. 42 and 43. However, the appellant cites no cases that we understand to require judicial notice of a 280–day period, and we find no such cases. Indeed, notice may be taken that not every period of gestation is precisely 280 days, *In Re Marriage of B.*, 619 S.W.2d 91, 93[2] (Mo.App. 1981), and numerous opinions recognize a broadly ranging gestation period. *See, e.g., Division of Family Services v. Guffey*, 795 S.W.2d 546, 550[5] (Mo.App.1990); *Rasco v. Rasco*, 447 S.W.2d 10, 17 (Mo.App. 1969).[4] Thus we do not believe the trial court abused its discretion in refusing to judicially notice a 280–day gestation period, choosing rather to permit the appellant to refer in closing argument to a range of 38 to 42 weeks.

Our research has identified but one case involving a *refusal* by a trial court to take such notice. In *Ugbaja v. Sumpter*, 821 S.W.2d 557 (Mo.App.1991), the putative father claimed the trial court erred in its failure to take judicial notice of "the normal human gestation period." *Id.* at 559. The court of appeals noted that application of a 280–day period indicated a conception date during a month when the mother said she had intercourse with the putative father and no one else. *Id.*

As was the case in *Ugbaja*, judicial notice of a 280–day gestation period would not assist the appellant in our case. The appellant's attorney was permitted to argue to the jury a range of 38 to 42 weeks, a range that did not include the 37–week gestation period established by the mother's testimo-

ny.[5] If the jury was unpersuaded by a departure from a range of normalcy, we cannot see how it would have been persuaded by a deviation from a specific date within that range of normalcy.

■ In the second portion of this point relied on, the appellant, in effect, challenges the sufficiency of the evidence to prove a gestation period shorter than 280 days. We have already concluded the court did not abuse its discretion in its refusal to judicially notice the 280–day figure. Nevertheless, we examine the record for evidence of a gestation period shorter than 280 days.

The mother testified she did not have sexual intercourse from March 1, 1984, until July 17, 1984, the date she said she had intercourse with the appellant. She had regular menstrual periods until early August 1984 when she missed a period and then learned she was pregnant. The child was born eight days before his due date. This evidence was bolstered by the mother's testimony that when she told the appellant she was pregnant by him he did not deny paternity, but instead said he wanted her to get an abortion, and when she refused an abortion, he told her he would not "run from" her. The testimony about the appellant's responses, if believed by the jury, was evidence relevant to proving paternity. *See T.A.L.S. v. R.D.B.*, 539 S.W.2d 737, 739 (Mo.App.1976). The mother's testimony provided evidence sufficient to meet her burden of proving that the gestation period for this child was less than the 280–day period the appellant requested the court to judicially notice. Point III is rejected.

*Point IV: Continued Presence of Exhibit before Jury*

■ In his final point on appeal, the appellant challenges the trial court ruling on

---

**4.** The *Rasco* opinion refers to a range of "at least seven to eleven months although nine months is the generally accepted time." 447 S.W.2d at 17. Because the opinion identifies nine months as "the generally accepted time," it appears the court in *Rasco* is referring to calendar rather than lunar months.

**5.** The evidence was that the child was conceived July 17, 1984, and born April 2, 1985, a gesta-

tion period of 259 days or 37 weeks. If we were to calculate the gestation period using the April 10 due date (which was described as "accurate by serial ultrasound" in the mother's medical records) rather than the birth date, the gestation period would be within the 38– to 42–week range the appellant requested and argued to the jury.

his motion for a mistrial because the enlarged version of the letter from Dr. Bias to Dr. Cross remained in view of the jury during the direct examination of the mother. We conclude Point IV has no merit.

A mistrial is a drastic remedy and should be reserved for only the most grievous of errors where the prejudice cannot otherwise be removed. *Seabaugh v. Milde Farms, Inc.,* 816 S.W.2d 202, 208[6] (Mo. banc 1991). The appellant cites no authority in support of his argument that the continued presence before a jury of the previously admitted exhibit was so prejudicial as to require the court to declare a mistrial as a matter of law. Our independent research discloses no support for such an argument.

To the contrary, the general rule is that it is within the discretion of the trial judge as to when, how, or if exhibits in evidence will be put in the hands of a jury for inspection. *See, e.g., Williamson v. St. Louis Public Service Co.,* 363 Mo. 508, 252 S.W.2d 295, 302 (1952); *Ashby v. Johnson,* 792 S.W.2d 7, 9[5] (Mo.App.1990); *Cox v. Blackwell,* 661 S.W.2d 831, 833 (Mo.App. 1983); *Wilkins v. Cash Register Service Co.,* 518 S.W.2d 736, 747[12] (Mo.App.1975); *Wren v. St. Louis Public Service Co.,* 355 S.W.2d 365, 371–72 (Mo.App.1962); *Hofstatter v. Johnson,* 208 S.W.2d 924, 926[4] (Mo.App.1948). Determination of the prejudicial effect in the handling of admitted exhibits is within the discretion of the trial court and that discretion will not be disturbed absent a showing of abuse. *Yeager v. Wittels,* 517 S.W.2d 457, 467 (Mo.App. 1974); *Wren,* 355 S.W.2d at 372.

Although the appellant's complaint here does not involve an initial decision by a trial court on when, how, or if the exhibit should be shown to the jury, we are not persuaded that the trial court abused its discretion in refusing to declare a mistrial after discovery of the continued exposure of the exhibit.

We affirm the judgment.