ROSEMARY BOUDINIER, RESPONDENT v. THORNTON O. BOUDINIER, APPELLANT.—203 S. W. 2d 89.

Kansas City Court of Appeals. Opinion delivered May 5, 1947.

*Homer A. Cope* and *Walter A. Raymond* for appellant.

*Louis L. Kirchner* for respondent.

BOYER, C.—This case presents another deplorable marital wreck with its genesis and consummation accomplished in the dramatic period of war. The defendant husband appeals from a decree dismissing his cross petition and which awarded plaintiff a decree of divorce and the custody of a child which the decree says was born of the marriage relation. Plaintiff was accorded judgment for the support and maintenance of said child in the sum of $25 a month, together with a stated amount for an attorney's fee, suit money, and costs. From the pleadings and the evidence the paternity of the child in question became the paramount issue in the case.

Plaintiff's petition alleged that she and defendant were lawfully married in Cheyenne on February 13; 1943; that they lived together as husband and wife until March 21, 1943, when the defendant as a member of the Armed Forces of the United States was transferred; that in July 1943, defendant spent his furlough with plaintiff in Kansas City where she was then living; that thereafter he became cold and indifferent toward the plaintiff, refused to correspond with her, stated that he did not care to live with her longer, and wanted a divorce. It was further alleged that defendant deserted plaintiff for a space of one year and had offered her indignities; that he was jealous and made numerous untrue accusations against plaintiff; stated that he did not wish to live with her and wanted her to get a divorce; that there was born of the marriage one daughter, Rosalie Marie Boudinier, on January 30. 1944. Jurisdictional facts of residence in Jackson County, Missouri, were set forth and plaintiff prayed for a divorce, alimony, custody, care and control of the infant child, and for its support and maintenance.

Defendant's amended answer and cross petition admitted the marriage and separation and plaintiff's residence as alleged. The answer denied the other allegations of the petition and specifically denied that defendant was father of the child, and alleged that he was the innocent and injured party; that plaintiff had offered him indignities rendering his condition intolerable in that while he was in the United States Army, she improperly associated with other men and as a result thereof gave birth to the child named in plaintiff's petition; that plaintiff was guilty of adultery; that there were no children born of the marriage between plaintiff and defendant; that the defendant was a resident of Kansas City, Jackson County, Missouri, for more than one whole year; that he had been a member of the Armed Forces, but at the time of filing of the amended answer and cross petition he was not in any branch of the military service, and prayed that a divorce be granted him on his cross petition.

Plaintiff's answer to defendant's cross petition was in the nature of a general denial.

When the picture of this case is unreeled by the evidence there is shown a rather salacious and sordid story. However unpleasant it may be, it appears necessary to state somewhat in detail the testimony of the various witnesses offered by the respective parties. As a preliminary to a statement of the conflicting evidence the following facts appear to be undisputed.

At the time of trial plaintiff was 21 years of age and defendant was 34. The marriage occurred in Cheyenne, Wyoming, February 13, 1943. The parties were then 18 and 31 years of age respectively. Defendant was in the army and stationed at Fort Warren near Cheyenne. By mutual agreement, plaintiff went from Kansas City to Cheyenne to visit defendant February 1, 1943. An arrangement had been made for her to live with Mr. and Mrs. James Pasley, uncle and aunt of the defendant. It was during her visit there that they decided to get married. There was some delay because defendant could not get a pass from camp and plaintiff had to get permission from her parents in Kansas City. After the marriage the parties lived together for a short time in the home of Mr. Pasley and later in a room which plaintiff obtained in another private home. They were together during week-ends and occasionally during the week when defendant could get leave. The defendant did not want a child during the war as he might never come back; he wanted to wait until he returned from the army. Defendant was transferred to another camp at Moses Lake, Washington, and by arrangement plaintiff left Cheyenne March 21, 1943 and returned to Kansas City where she made her home with defendant's mother, Mrs. Edith Arnold at 3029 Tracy. She resided there from March 23 to the latter part of July 1943. During the time plaintiff and defendant lived together in Cheyenne, they had sexual relations at various times, the last one occurring on March 20, 1943. Plaintiff experienced her regular menstrual period about February 24, and on about the same date in March after she returned to Kansas City; she also experienced a menstrual period in April 1943, but had none after April until after the birth of the child which occurred January 30, 1944. Defendant visited plaintiff from July 8 to July 16, 1943, during which time they lived together as husband and wife. At that time plaintiff informed defendant that she was concerned about having skipped two periods, those of May and June; that she did not know she was pregnant and did not tell him so. Later, in a letter dated August 30, 1943, defendant requested her to go to an X-ray doctor for the purpose of ascertaining whether she was pregnant and how long she had been in that condition. Plaintiff did not do as her husband had requested and did not submit to an X-ray examination but consulted physicians of her own selection, one of whom definitely in-

formed her that she was pregnant and she so notified defendant. Upon learning this fact defendant became suspicious and doubtful as to the probability of his being the father, and because of this he practically ceased writing to plaintiff after August 1943. Plaintiff left the home of defendant's mother and went to live with her own mother and her family. After defendant's furlough in July 1943, he was sent overseas as a member of the Armed Forces where he saw service in Italy, and did not return to Kansas City until December 23, 1945, after receiving an honorable discharge from service.

Plaintiff testified that she went to Cheyenne at defendant's request and arrived there February 1, 1943. She testified to their place of residence while in Cheyenne as heretofore stated; that she worked a short time at the post exchange at Fort Warren, where defendant was stationed; that defendant obtained three or four week-end passes while she was in Cheyenne; that he came in from the Fort once or twice a week, and that on such occasions she and defendant cohabited, the last time being March 20. After her return to Kansas City, plaintiff was employed by the Western Union where she had worked before her marriage as a teletype operator. She quit work there May 9. While working at the Western Union her hours were from 4:00 p. m. to midnight, except when she worked overtime, and when she worked overtime the Company furnished an escort home for her; that after plaintiff left Cheyenne she wrote to her husband two or three times a week; that after his furlough in July, defendant wrote plaintiff only three or four letters; in the first two or three he did not make any accusations about the paternity of plaintiff's expected child, but in the last letter he stated that he did not think he was the father of the child and wanted a divorce. This last letter was written August 30, 1943. Plaintiff introduced several letters written to her by the defendant, one dated July 18, 1943. The concluding paragraph was the only part plaintiff sought to put in evidence and it reads as follows:

"In closing I want to say that it has made me feel very good to think that I made you happy most of the time I was with you and remember what I said about this 'happiness deal' and about pretty girls being happy. I remember Danny at the piano playing 'Be Honest With Me Dear, Whatever You Do.' "

Another letter from defendant dated July 24, 1943, contains this paragraph which plaintiff called to the attention of the court:

"Yes, my lady, I guess old Father Time will decide in regard to the problems that you and I seem to have, let us hope that everything will turn out for the best for all concerned soon. But regardless I hope you will not forget my respect and admiration for you."

Extracts from another letter written by defendant August 2, 1943, read as follows:

"Dear, let me go back a bit to the time when I spent my furlough with you those 8 days. I really enjoyed myself, was happy to be with you and was greatly impressed with you, your health and beauty, and things in general, except that I was somewhat concerned. when you told me about the 2 months you skipped and going to see the doctor, it puzzled me. * * * Well, honey, in reading your last letter saying it is quite possible that you are pregnant has disturbed me very much. I hardly know how to word this, it has me puzzled so. I have your letter of March 23, 1943, just after you returned from Cheyenne saying you came sick upon arrival. I was never so much relieved in all my life, I thought my troubles were over, I thought I had won in my efforts to avoid pregnancy. Now it is staring me in the face again. * * * Well Rosemary, I guess I have just about said my little speech, it all adds up to the fact that the small amount of time you and I have been together and as much as I have guarded against it, it isn't clear to me how I could be responsible for making you pregnant. I just don't understand it."

The last letter offered in evidence was dated August 30, 1943. In this letter defendant wrote:

"I feel there is something you are keeping from me. * * * You may ask why I have this feeling. Well for one reason you say your child will be born the latter part of Jan. or the first of Feb. and is mine as of sometime in March. That being the case it seems to me this thing happened in May some time. * * * At mine and mother's expense you must go with mother to a reliable x-ray specialist for an examination to determine just when this all started and to be done by mother's doctor, not yours. If you refuse to do this and unless I get a report direct from an x-ray doctor, other than yours, I cannot recognize it as my child, and will be forced to ask for a divorce. * * * Your allotment checks will probably continue as long as I am in the army, but do you think I could live with my wife if her child is sired by another man? No, not me Rosemary. You should know that from way back."

Plaintiff said she did not go to an X-ray doctor pursuant to the request of her husband; that she consulted her mother and selected her own doctor. She further testified that she knew her husband went overseas in December before the baby was born, and that she wrote to him twice. The only other letter she ever received from him was written about a year later from Italy.

On cross-examination plaintiff said she did not tell her husband she was pregnant when he was home in July because she didn't want to worry him; that she didn't know she was pregnant even though she had missed two periods, and said: "I didn't think anything

about it. When I came sick upon arrival I let it go at that, I didn't think I was pregnant." She said she had her regular menstrual period in March, but it wasn't like her regular period; it lasted about three or four days. Plaintiff also stated in response to questions that she did not take any precautionary measures while she and her husband lived together; that she took a douche once or twice in Cheyenne, and didn't use any other preventives; that after she returned to Kansas City she wrote her husband that she had her menstrual period and stated she was happy. In this letter she stated to her husband: "Darling, I have the greatest news. I came sick finally." Plaintiff also said she did have a period in April also which lasted three or four days, but did not have such periods in May and June. Plaintiff denied that she kept company with any other men in Cheyenne while her husband was on duty. She was asked if after she came back to Kansas City, she kept company with any other man and said "No." "Q. Did you have any other men in your room? A. Yes, Thornton's cousin. Q. Thornton's cousin? A. Yes. Q. What was his name? A. Clair Reese. He was living there at the time. Q. In other words, when you came home he was living at Mrs. Arnold's apartment? A. Yes, he was. Q. Did you keep company with Clair Reese? A. No, occasionally he took me down to work on his way to some place. Q. Did he visit you in your room at that apartment? A. Well, he lived in the same place. Q. Did he visit you in your room in that apartment? A. I slept with my mother-in-law in the front room. Q. You weren't working during the day, were you? A. I slept, I worked—when I worked until 6:00 o'clock I slept until time to go to work, by that time Mr Reese— Q. Mrs. Arnold worked during the day? A. Yes, she did. Q. Was there any time that Mr. Reese was in your room during the day? A. I was never in his bedroom when he was. Q. Beg pardon? A. I was never in his bedroom when he was, but the living room was my bedroom along with my mother-in-law." She denied having any improper relations with Reese.

Inquiry was then made about her relationship with one Donald Carroll in this manner: "Q. Do you know a man by the name of Donald Carroll? A. Yes, I do. Q. You kept company with him, didn't you? A. Yes, I did, upon my husband— Q. When did you start keeping company with Donald Carroll? A. When my daughter was ten months old. Q. That is while your husband was overseas? A. That was at his request. He told me he thought I found somebody else after I sent him a picture of his own baby. Q. You started going with Donald Carroll before your husband knew anything about it, isn't that true? He didn't know anything about you going with Donald Carroll? A. I didn't know where he was at. Q. While he was overseas I say you began to keep company with Donald Carroll? That is correct? A. That is right. Q. You

continued to keep company with him regularly? A. That is right. Q. You wrote him? A. That is right. Q. Corresponded with him? A. That is right. Q. You used very loving and endearing terms to him in your letters, didn't you? A. Off and on, yes. Q. Were you upset about anything so far as your relation with Clair Reese was concerned? A. No, I wasn't.''

Plaintiff stated that she knew Anna Carroll of St Louis who was a sister-in-law of the Donald Carroll heretofore mentioned. Plaintiff identified a letter addressed to Anna Carroll, dated October 28, 1944, as being in her handwriting. It was addressed to ''Dear Anna'' and reads in part as follows:

''Anna, in heaven's name, don't let anyone see this letter as I'm going to ask you a question, and wish you'd write back right away and answer it. I may come to St. Louis while Mom and Blanche are still gone and file suit for my divorce, so they wouldn't be able to in any way stop me. So should I even mention anything about Clair—about his living at the house when I was living there? Don said in his letter I'll have to tell the lawyer everything that happened, from first to last, of my marriage to Thornton, and I'm afraid if I say anything to him about Clair, he may check on him or something. What do you think kid? That's about the only thing now that is holding me back. Please kid, write me just a short letter anyway and tell me what to do. As you're the only one who knows anything about Clair. * * * Tell Donald I love him more and more and to keep writing.''

Plaintiff said the first time she definitely learned she was pregnant was the first part of August when she was examined by Dr. Busenbark of Kansas City, Kansas. She then went to another doctor who delivered the child which weighed eight pounds. She said she had a normal delivery except she had a hard time and a normal convalescence at the hospital; there was a natural delivery of the child without instruments; that she had expected the baby would come around the 10th of December or around Christmas time, and that she was expecting the child any time from Christmas until she was born. She said she expected to marry Carroll when she got her divorce; that he visited her in Kansas City approximately once a month beginning about October 1944; that at one time she visited Anna Carroll in St. Louis and went out with Carroll at least once; that she had occasional dates with Carroll when he was visiting in Kansas City. ''Q. You corresponded regularly with him, didn't you? A. That is right. Q. You called him endearing names in that correspondence? A. That is right. * * * Q. As a matter of fact, you and he, after you were married, planned on having him adopt this child? A. That is right.''

Plaintiff also testified that she had some trouble with Mrs. Arnold, defendant's mother, who had accused her of many things, and had drawn the army allotment for seven months after plaintiff's marriage to defendant, and that Mrs. Arnold was at the same time holding down two jobs; and that plaintiff had to apply for the allotment herself.

One of plaintiff's witnesses, Mrs Marjorie Starcher, testified on cross-examination that she had heard plaintiff talk about Donald Carroll and that they planned to marry.

Mrs. Peggy Mears, one of plaintiff's sisters, testifying in her behalf said that she and plaintiff were companions and went out together; that she knew of the association of plaintiff and Donald Carroll and that it was sometime after the baby was born; that she went out on dates with them; that her sister, the plaintiff, became acquainted with Donald Carroll through Anna Carroll, his sister-in-law, while she was in Kansas City; that the relationship between her sister and Donald Carroll began when he wrote and asked to visit her and he continued to visit thereafter. "Q. Your sister was in love with Don Carroll, wasn't she? A. I don't know, I suppose so, it wasn't none of my business. Q. They were from appearances? You would say they were pretty fond of each other? A. Yes, they were. Q. Would they hold hands? A. Sure, anybody would hold hands. Q. Did they use endearing terms addressing each other? Would she use endearing terms to him and him to her? You know what I mean by endearing terms, love and affection? Did they display any love and affection there? A. They kissed each other. No wrong in that. Q. I don't know. How many times would you say they kissed each other? A. I wouldn't know. Q. How many times did you see them kiss each other? A. Oh, enough. Q. Enough? A. Sure. Q. How many times in your opinion is enough? A. Well, I don't know." This witness also stated that Carroll visited her family up here and plaintiff visited his family in St. Louis, and that this was while Sergeant Boudinier was overseas. "Q. Did you ever see your sister seated on Donald Carroll's lap while he was visiting up here? A. Oh, yes, I have, too, though. Q. They were pretty affectionate toward each other? A. All right, I guess, I don't go around noticing in particular what they are doing."

Dr. H. H. Owens of Kansas City was called as an expert witness on behalf of plaintiff. He testified to a wide experience in obstetrics since 1918, and that he had delivered "a few thousand babies"; that the normal period of pregnancy or gestation of human beings is 280 days, usually referred to as ten lunar months, but there are extremes and medical books record cases as long as 330 days; that in his actual experience he had only one case that went as long as 308 days. In answer to a hypothetical question based upon the facts in evidence, he testified that in his opinion it was possible

the child born to plaintiff on January 30, 1944, was conceived at the time of intercourse between plaintiff and defendant on March 20, 1943, or in prior relations between these parties. He also testified that it was possible for a woman to menstruate, or rather what they call menstruate and which he chose to call bleed, at regular periods as many as three times after they have become pregnant. He also stated that almost all pregnancies are of a normal period of gestation, or within a week or two of it. The foregoing, with the testimony of witnesses as to plaintiff's good reputation, constitutes the substance of the proof in plaintiff's behalf.

Defendant testified that he was inducted into the United States Army December 9, 1942, and was honorably discharged December 21, 1945; that he was overseas during 1944 and 1945; that he first learned of a contemplated divorce while he was overseas in service; that he was transferred from Fort Warren on March 21, 1943; that he lived with his wife in Cheyenne from February 13 to March 20, 1943; that he did his best to get into Cheyenne every week-end but couldn't always make it; that he went in evenings whenever he could but that wasn't very often; that he never saw his wife in company with any other man while he was in Cheyenne; that whenever he had relations with his wife they both used contraceptives; that he had brought up the subject with his wife; that he didn't feel it was a wise thing to have children during the war time; that his wife left Cheyenne the evening of March 20, 1943; that when he visited his wife in July during his furlough period, she was puzzled about the two periods she had missed during May and June; but the matter was discussed very little with her; that he didn't learn plaintiff was pregnant until she consulted a doctor and wrote him; that it was defendant's own idea to have his wife go to an X-ray specialist, and he did not have the advice of anyone when he wrote that to her; that he didn't know personally of any acts of adultery on the part of his wife; that after his letter to plaintiff demanding that she go to an X-ray specialist and have that party render a report to him and his mother, he was so busy being transferred around the country he didn't have time to write and became disgusted, but thinks he wrote plaintiff. The only letter defendant wrote plaintiff after August 30, 1943, was in June 1944, acknowledging a Christmas present sent him at Christmas in 1943. After defendant's discharge from the army he did not notify his wife of his return to Kansas City, and said he figured the stoppage of the allotment check would notify her. After returning to Kansas City, defendant had a few dates with women attending roller skating parties and three or four times to shows; that he felt lonely and wanted companionship.

During the examination of defendant, plaintiff's counsel objected to any testimony tending to contest the legitimacy of the child on

account of the presumption in favor of it if born during the period of lawful wedlock. In answer to that objection, the court stated: "The presumption is conclusive as to him being the father of this child, the law will not permit him to say that he is not the father of the child. * * * The presumption is conclusive, binding upon him."

Defendant offered in evidence the birth certificate of the child filed with the Board of Health, Division of Vital Statistics of the State of Kansas. This certificate gives the name of the child, the date of birth as January 30, 1944, number of months of pregnancy as 9, name of father, Thornton Ogdon Boudinier. The certificate of the doctor recites: "I hereby certify that I attended the birth of this child who was born alive at the hour of 4:06 p. m. on the date above stated and that the information given was furnished by Mrs. Boudinier related to this child as mother."

The defendant called Dr. Gerald W. Barry as an expert witness upon his behalf who had been in practice since 1926, and specialized in obstetrics and gynecology. Upon a hypothetical question based upon all the facts in evidence, the doctor was asked if he had an opinion as to when the child in question was conceived. Upon objection by plaintiff's counsel that the question was aimed at an attack upon the legitimacy of the child, the court sustained the objection and said: "It is an indirect attack· on the legitimacy of the child which the law makes absolutely conclusive. He had the opportunity for access to her, he did have and therefore it is conclusive on him. * * * He is the father of the child." Defendant offered to prove by this witness that if the court would permit the witness to ·answer he would testify the child was conceived in April 1943. The offer was denied. Dr Barry also testified to the normal period of gestation and to the possibility of unusual and exceptional variations similar to those shown by the testimony of the doctor who testified for plaintiff, and stated that it was possible in exceptional instances that the actual duration of pregnancy may equal if not exceed 300 days.

Mrs. Edith Arnold, defendant's mother, testified in reference to the arrangement and occupancy of the apartment in which she, two of her nephews, and plaintiff resided. It was a small apartment consisting of two rooms and a small kitchen. Plaintiff and Mrs. Arnold occupied a bed in the front room and the two nephews, Clair Reese and Junior Winn, occupied the bedroom. There was also another Navy boy who came from Olathe to visit Clair; he had a key and would come any time he wanted to. There was but one bathroom, and when it was necessary for the boys to visit it they would be required to pass through the room where plaintiff was sleeping. Mrs. Arnold stated she suspected plaintiff was pregnant and talked to her about it and told her she looked like she was

two months gone; she denied that she suggested an abortion. She said that after she suspected plaintiff was pregnant she began examining her clothes about the last of April; that she found semen on her panties; that she also discovered a spot on a sheet with which she had freshly dressed the bed and said she waited until plaintiff came home and asked her if she saw that, and said to her: "Well, I know what it is, I know it doesn't belong to me. Doesn't it belong to you," and that plaintiff said: "I don't know," and made no admissions at the time. Mrs Arnold also said she never saw plaintiff in a compromising position with anyone. She was asked if she objected to Clair Reese taking plaintiff to work and said she did not; that she trusted him and her and saw no harm in that; that during the time plaintiff remained in her apartment she and Reese were both employed at night work and slept during the day in their adjoining rooms.

Mrs. Freda Love was the manager in charge of the apartment where plaintiff lived. She said she had seen plaintiff get out of a car a block away from the apartment in the night; that she saw plaintiff come in with Mr. Reese several times; that they used to stand on the porch and talk before they went in; that once, during the day, witness wanted to get into the apartment to examine the plumbing in connection with trouble in the apartment; that plaintiff came to the door in her negligee and refused witness admission to the apartment saying there was nothing wrong with the plumbing; that at the time witness heard someone walking rather heavily in the apartment; that it developed the trouble was in that particular apartment, but the plumber managed to handle it from underneath without disturbing plaintiff.

Defendant's uncle, James Pasley, with whom plaintiff and defendant lived for a while in Cheyenne, testified that after they were married and after plaintiff left his home he saw her on the streets of Cheyenne at different times on the arm of other soldiers while her husband was in camp, and that he saw her with at least two different soldiers.

Contending counsel are in agreement that from the nature of the case it is here for review upon both the law and the evidence as in suits of an equitable nature. This is true not only because of prior adjudications, but also according to the provisions of Sec. 114 (d) of the new Civil Code of Missouri, shown in Laws of Missouri 1943, page 388. It also follows from the above that there is placed upon this court the responsibility to determine the sufficiency of the evidence to support the judgment rendered, and in doing so to make its own finding of facts and conclusions and determine whether the trial court properly applied the law to the facts in the case. It is also within the province of this court to affirm or reverse the judgment of the trial court or to give such judgment as the trial court ought

to have given as the appellate court shall deem agreeable to law. Sec. 140 (c) of the Civil Code of Missouri shown in Laws of Missouri· 1943, page 395.

Counsel are in conflict in reference to the effect of the presumption of legitimacy of a child born during the period of lawful wedlock. Appellant urges that the court erred in its ruling and decision that the presumption of legitimacy could not be rebutted by proof of the facts, and in refusing to permit defendant to deny paternity of the child in question. Counsel for respondent contended upon the ' trial, and still insists here in brief and argument, that the presump-. tion of legitimacy as ruled by the court was conclusive and not rebuttable. Upon this proposition respondent cites Jones On Evidence, 4th Edition, Vol. 1, Sec. 95, p. 165, and Ash v. Modern Sand & Gravel Co., 122 S. W. (2d) 45, 50.

The section of the work above referred to sustains respondent in part, but the full significance of what is there said, read in the light of the two preceding sections of the same work, demonstrates that the presumption of legitimacy is not conclusive but is a question of fact for determination upon evidence to the contrary. Section's 93 and 94 show how the rigid and ancient rule of the common law that the presumption in favor of legitimacy was conclusive has been modified and repudiated. In Sec. 93 the author states: ''The law presumes that a child is legitimate and that he or she was conceived within the normal period of gestation. * * * This presumption is the application of a particular branch of the broader presumption in favor of innocence.'' In Sec. 94, the author states: ''There has been much controversy as to whether, in order to rebut the presumption of legitimacy, the proof should show that it is impossible or merely improbable that the husband is the father of the child. The rule seems now well established in England and in this country that non-access need not be shown beyond any possible doubt. Mere suspicion or the remotest possibility of access is not enough to sustain the presumption of legitimacy.'' In the citation of cases the author refers to In Re Findlay, 253 N. Y. 1, 11, 170 N. E. 471, as authority for the statement that ''the presumption of legitimacy is not conclusive but must yield to reasonable probabilities.'' The learned . judge writing the opinion in the Findlay case has thrown a flood of light upon the development from the ancient to the modern rule in respect to the presumption in question and gives expression to a number of conclusions that may be applied to the pending case. After reference to certain cases on page 7 of the opinion, the judge states: ''Since then the presumption of legitimacy, like other presumptions, such as those of regularity and innocence, has been subject to be rebutted, though there have been varying statements of the cogency of the evidence sufficient to repel it.'' On the following page the opinion also states that the courts are generally agreed that counter-

vailing evidence may shatter the presumption that the possibility of access is not susceptible of exclusion to the point of utter demonstration. The strength of the presumption is recognized and the court states "that it will not fail unless common sense and reason are outraged by a holding that it abides. * * * The presumption does not consecrate as truth the extravagantly improbable."

Pronouncements of the Supreme Court of our own state have clearly demonstrated that the modern and prevailing rule is that the presumption that a child born during the period of lawful wedlock is legitimate may be rebutted and overthrown by proof of facts to the contrary. In the case of Bower v. Graham, 285 Mo. 151, l. c. 162, 225 S. W. 978, in the course of the opinion the court states: "We do not, however, think it improper to consider this record from the standpoint that the presumption arising from the birth of the child in lawful wedlock may be disputed by showing the fact to be otherwise." In the case of Drake v. Milton Hospital Assn., 266 Mo. 1, 178 S. W. 462, on page 11 of the State Report the court said: "The presumption that a child born in wedlock is legitimate is not an absolute one, but is rebuttable." The foregoing pronouncements apparently have never been overruled or critized. In Needham v. Needham, 299 S. W. 832, 834, the St. Louis Court of Appeals, after reference to the presumption that prevailed at common law, states: "The modern doctrine undoubtedly is that the presumption may be overthrown by any competent and relevant evidence disclosing that the husband could not have been the father of the child." Citing the Drake case, supra. Cf. Morrison v. Nicks, 200 S. W. (2d) 100.

From the foregoing cases and references in the opinions, it appears that the great weight of authority sustains the contention of appellant that the presumption of the legitimacy of a child born during wedlock is not conclusive, but may be overthrown by evidence of sufficient weight and clarity to convince the triers of the fact. The defendant in the pending case was denied the privilege which was clearly his of questioning his paternity of the child born to plaintiff. Upon this subject we are of the opinion and rule that the learned trial judge was in error in his view of the law that the presumption of defendant's paternity was conclusive and that he was not permitted to deny it. This so clearly appears from the pronouncements of the court during the trial that there can be no question about it. We think the trial court was also in error in denying the defendant the privilege of the testimony offered by his expert witness. We think that the proffered proof of the opinion of this witness that the child in question was conceived after March was competent evidence on a question which was not clearly within judicial cognizance in view of the very unusual and exceptional period of gestation claimed to have existed by the plaintiff. The court did permit

this witness to give his opinion that under the facts attending the accouchement of plaintiff and the birth of the child, it was in his opinion a nine months' baby. This was testimony which has not been stated heretofore. The opinion of the doctor as to when the child was conceived, we think, was competent evidence. It was offered for the purpose of proving the charge of adultery as well as the illegitimacy of the child. The court rejected the evidence for the stated reason that it was an indirect attack on the legitimacy of the child which the law makes absolutely conclusive. It is abundantly clear from the evidence, and of which the court may take judicial notice, that the normal period of gestation is 280 days. The period claimed by the plaintiff was from March 20, 1943 to January 30, 1944, a period of 316 days. Such a greatly extended period is not of such common knowledge as to warrant judicial notice. State v. Drummins, 274 Mo. 632, 204 S. W. 271; Francis v. Terminal Railroad Assn. of St. Louis, 193 S. W. (2d) 909; Ritayik v. Ritayik, 202 Mo. App. 74, 213 S. W. 883; 31 C. J. S. sec. 79, p. 666; 20 Am. Jur. sec. 73, p. 95. If the evidence was competent for any purpose it should not have been excluded. Neal v. Caldwell, 326 Mo. 1146, 34 S. W. (2d) 104. The rejected testimony will be considered as evidence in the case. Sec. 114 (d) Laws of Missouri 1943, page 388.

The next question of importance is whether, under the evidence in the case, the proof in behalf of defendant was sufficiently clear to overcome the presumption of his paternity of the child and to justify a finding in his behalf on that issue. We are of opinion and find that under the cumulative effect of all the facts and circumstances in the case the presumption of paternity of defendant was overthrown, and particularly for the reason that it is clearly apparent defendant did not have access to his wife at the beginning of any reasonable period of gestation, but was absent during all of such period. The period of 316 days from conception to birth, as claimed by plaintiff, is so extraordinary and contrary to common knowledge, experience, and the laws of nature, and so extravagantly improbable, it should not be accepted as the truth. Periods of shorter duration have been held to be sufficient to justify a finding of illegitimacy. In the case of Commonwealth v. Kitchen, 11 N. E. (2d) 482, the proof supported a finding of non-access for 305 days before the birth of the child. In consideration of that case the court said: "But proof of the absolute impossibility that the husband could be the father of the child is not required to overcome the presumption of legitimacy. We think that it is a matter of common knowledge that a period of gestation of 305 days is highly unusual and improbable." In the case of In re McNamara, 181 Calif. 82, 183 Pac. 552, there was a ruling to the same effect upon a showing of non-access for a period of 304 days preceding the birth of the child. In that case the court

observed that any period in excess of 300 days is quite exceptional, and that with each day over 300 the exceptional character of the case is much intensified; and further, that instances of more than 300 days are entirely beyond the usual order of things and that the conclusive presumption cannot be applied to such extreme and exceptional cases. To do so would be wholly unreasonable and would be contrary to the legal presumption that things have happened according to the ordinary course of nature.

In the case of Dieterich v. Dieterich, 278 N. Y. S. 645, there was an effort to compel support by a putative father, and upon a showing of non-access by him for a period of 301 days before the birth of the child, it was ruled that a finding of infidelity on the part of the wife was justified. In view of all the foregoing, we find that a preponderance of the evidence in this case shows that the defendant was not the father of the child in question and that the decree of the court that the child was born of the marriage is not sustained by the proof.

The case of Ash v. Modern Sand & Gravel Co., 122 S. W. (2d) 45, cited and relied upon by respondent, shows such a difference in the state of facts as to render the decision and what the court said in making it of little or no applicability to the questions which we have to determine. In that case an insurer was attempting to bastardize the child of a deceased workman to avoid liability under the Workman's Compensation Act. The workman had recognized the child, cared for it, and helped support it; and in his verified petition for a divorce against the mother alleged that the child was born of the marriage. In the pending case there was never any recognition by the defendant of the child in question, but a consistent denial of paternity on his part.

There is no sufficient support for the decree in the testimony of plaintiff's expert witness. He did not even testify to an opinion that conception occurred on March 20, 1943, but merely stated that under the facts and circumstances of the case it was possible and, so far as the medical testimony is concerned, the decree has no basis whatever except upon a mere possibility of defendant's paternity of the child. We do not regard that as sufficiently substantial to support the finding made by the court.

Respondent stresses the fact of the deference that should be given to the findings and conclusions of the trial court who had an opportunity to observe the witnesses and to judge of their credibility. We are fully aware of and recognize such a rule as applied to a finding of facts made by the trial court upon conflicting testimony. But in the present case, it is apparent that the judgment was not reached upon any such basis. It is obvious that the decree was induced by an erroneous view of the law, and when such appears to be the fact it is the duty of this court to correct the error.

We further find that the decree of divorce in behalf of plaintiff cannot be sustained for another reason. To be entitled to a divorce, she was required to show that she was an innocent party and had faithfully discharged her reciprocal duties. Speiser v. Speiser, 188 Mo. App. 328, 125 S. W. 122; Miles v. Miles, 54 S. W. (2d) 741, citing Libbe v. Libbe, 157 Mo. App. 701, and many other cases holding to the same effect. We find from the evidence in this case that plaintiff's conduct during her marriage to defendant, as shown by her own testimony and that of her witnesses, was such as to offend the dignity of the marital relation and showed a total disregard of her duty as the wife of defendant. We say this because of her admitted relationship with her friend, Donald Carroll, as well as the inferences that might be drawn in reference to her relationship with Clair Reese which appeared in her letter to her friend, Anna Carroll. It appears that plaintiff adopted her own code of morals and conduct at variance with all that was conventional and recognized as proper standards. She determined that Cupid should not be an exile merely because her husband was on foreign shores. Her letter to her friend Anna Carroll, about her relationship with Clair Reese, is at least highly suspect and shows that there was something she desired to conceal.

The only remaining question is whether under the evidence defendant was entitled to a decree. In view of the conclusion heretofore reached we think he was, and that the court erred in dismissing his cross-bill. In our judgment, there is no evidence of any misconduct on his part that would debar him from the right to a decree. There is no evidence showing incontinence or unfaithful conduct on his part.

In view of all of the foregoing, it is our conclusion that plaintiff's petition should have been dismissed and that the judgment in her favor should be reversed, except for the allowance of attorney's fee and suit money; and that this cause should be remanded with direction to dismiss plaintiff's petition, reinstate defendant's cross petition, and grant him a decree of divorce. The Commissioner so recommends. *Sperry, C.,* concurs.

PER CURIAM:—The foregoing opinion of BOYER, C., is adopted as the opinion of the court. The judgment is reversed, except as to the allowance of attorney's fee and suit money, and the cause remanded with direction to dismiss plaintiff's petition, reinstate defendant's cross petition, and grant him a decree of divorce. All concur.