**Dorothy A. RASCO, Appellant,**

v.

**Dale E. RASCO, Respondent.**

No. 24631.

Kansas City Court of Appeals.

Missouri.

June 2, 1969.

Motion for Rehearing and/or Transfer Denied Oct. 6, 1969.

Application to Transfer Denied Dec. 8, 1969.

Richard W. Mason, St. Joseph, for appellant.

Richard W. Dahms, St. Joseph, for respondent.

PER CURIAM.

We have before us a divorce suit which was contested in the trial court on three fronts. In the center was the battle for the divorce itself, which revolved mainly around the charge that the wife had committed adultery. On the right was the usual controversy over custody of minor children. On the left was an uncommon dispute, one concerning the husband's assertion that he was not the natural father of the fifth child. The trial court resolved all three issues in favor of the husband.

The plaintiff, Dorothy A. Rasco, then 18 years of age, and the defendant, Dale E. Rasco, then 21 years of age, were married on May 11, 1945. At that time this couple possessed very little, if any, material wealth. Their first home was a rented two-room apartment in St. Joseph, Missouri. These people lived together for almost 20 years without any serious marital disturbances, or at least any open breaks.

Each had regular outside employment. Mr. Rasco has for many years worked for the Lehr Construction Company, St. Joseph, Missouri, as a carpenter. The record does not reveal the amount of his earnings. Mrs. Rasco, during the early marriage years, had periods of employment with the Chase Candy Company and with the Whitaker Cable Company. For the immediately past eight or nine years she has been a regular machine operator employee of the Western Tablet Company in St. Joseph, Missouri. Her earnings in 1966 approximated $70 weekly. She worked regularly throughout the whole period of their married life except for the short periods of her childbirth confinements and for occasional layoffs. These parents were industrious, frugal and good managers. In addition to her outside employment, Mrs. Rasco took care of the house and the children. She prepared the meals, did the laundry and helped generally in the home. For the last few years she has been aided in the performance of these domestic duties by the eldest child, a daughter, and by Mrs. Ella Thompson, who lived in the home and functioned as partial housekeeper and caretaker of the children. Several years ago, the parties bought for $5500 a small acreage with an old house on it which was located near Agency, Missouri. Mr. Rasco, aided to some extent by his wife and elder sons, enlarged, completely rebuilt and modernized this house. The material results of their industry, frugality and financial common sense were apparent by the year 1965. At that time the Agency acreage with the modern house on it was worth from $12,000 to $15,000 and was paid for. They had paid $1100 for a lot located in the Ozark region near Branson. They had nice household furniture and a new Olds automobile. They owned some livestock and each possessed savings bonds which had been purchased each month, out of their earnings, by their employers. In addition to these financial assets the Rascos, in early 1965, were the parents of four children—all in good health, well behaved and making good progress in school. This

family's outlook for the future at that time appeared to be good.

Mrs. Rasco testified that during 1963 and 1964, her husband persistently accused her of improper relations with other men —not with any particular man, but with men generally. She said that Mr. Rasco had always been close with respect to money matters but that during this later period he became very exacting as to her expenditures; that he demanded that she deliver her pay checks to him and he would then give her one or two dollars as he thought necessary. She said she was required to account for her every disbursement—from the purchase of anklets for one of the children to the pennies she dropped in parking meters.

Mr. Rasco testified that in March, 1965, he was looking in a dresser drawer for an old army picture and found therein a diaphragm. He said it was wet and he accused his wife of having used it with other men. She denied these charges. He repeated them. Finally, on March 21, 1965, Mrs. Rasco left the Agency home and rented an apartment at 1901 Edmond Street, St. Joseph, Missouri. With her to this new address at that time went her daughter, Linda, the two youngest boys and Mrs. Thompson, the housekeeper. Apparently, the oldest boy, Edward, stayed with the father. It might here be noted that this separation date, March 21, 1965, was nine months and nine days prior to the birth of the child, William Dean, of whom defendant denied being the father.

Neither party had any real criticism of the other except as just set forth. Mr. Rasco visited his family in St. Joseph at least every week and he tried to persuade his wife to return to Agency. She did return in June, 1965, but remained only five days and then again came to St. Joseph and shortly thereafter rented a house at 2327 Excello Drive in St. Joseph, Missouri. Mr. Rasco testified that he and his wife cohabited until she left in March, and again during the five days in June while she was in Agency. Mrs. Rasco said this

was true and that in addition, they had cohabited from March until June, while she was in St. Joseph. These acts, she said, occurred on the occasions of his visits.

It seems at least possible, if not probable, that these two people might have become reconciled in June, 1965, except for the fact that between March and June, two outsiders became involved in their domestic difficulties. Mr. Arthur Ritchart, an employee at Westab, testified that he saw the automobile which Mrs. Rasco drove regularly and one belonging to Mr. Jerry Allen, machine adjuster at Westab, parked near the outskirts of St. Joseph, and that Mr. Allen and Mrs. Rasco were seated in her vehicle. He wrote down the license numbers and said he checked later to make sure those were the automobiles belonging to Mrs. Rasco and Mr. Allen. He watched for them on other occasions and saw them once more. It was his testimony that he did these things because of curiosity. Apparently he smiled while testifying and when asked why, he replied: "Man, I'm a happy man". On cross-examination he said a further reason for his detective work was because he didn't like Jerry Allen. Mr. Rasco apparently heard rumors of Ritchart's investigative activities. In any event, he went to see Ritchart early in June or prior thereto and Ritchart told the story to him. Mrs. Imogene Rasco is the sister-in-law of Dale Rasco. Early in June, 1965, she told Dale Rasco that about eight years previously plaintiff had told her about having had an affair with a Mr. Doyle Ussary, a neighbor, living in the Agency community. This affair included (1) Ussary kissing plaintiff while she was hanging up clothes one evening in the yard at her home and while her husband and children were in the house; (2) a meeting and conversation at the mail box and (3) having spent one night with Ussary in his home while his wife and children were away. Imogene Rasco had kept quiet about all this for eight years because she said that she on her part, had told plaintiff about some of her own extra curricular activities. She spoke up and told Mr. Rasco

about it in 1965, she said, "for the welfare of the children".

So when Mrs. Rasco returned to the Agency home in June for a possible reconciliation, her husband charged her with those and with other misbehaviors and said that before they could be reconciled she must make full confession. Both agree he made such demands. She refused to make any confessions, said she was not guilty and after five days, left Agency and went back to St. Joseph. The parties never lived together thereafter.

To sustain her reputation and position, plaintiff produced the testimony of six fellow Westab employees, including her foreman, Gene Whiteman. Those six fellow employees had known her, had observed her and had associated with her for periods ranging from three to six years. Each one testified that her behavior and reputation were good. Two neighbors, during the period of her residence on Edmond Street, and two while she was living on Excello Drive, gave like testimony.

In addition to himself, Imogene Rasco, sister-in-law, and Arthur Ritchart, testified on behalf of defendant and told their stories. Such was substantially the evidence except for the testimony of Dr. Richard Rydell, M.D., a pathologist at the Thompson, Drumm, Knepper Clinic, St. Joseph, Missouri, whose testimony the trial judge apparently regarded as not only persuasive, but as conclusive on the issues of adultery and the paternity of the fifth child. At the time of the trial plaintiff had given birth—all occurring during the period of wedlock—to five children, namely: Linda Sue, then 19 years of age, who was married and emancipated; Edward, age 17 years; Kenneth, age 13 years; Brett, age 7 years, and William Dean, who was born on December 30, 1965, exactly nine calendar months and nine days after Mrs. Rasco left the Agency home for the first time on March 21, 1965, up to which time both parties agreed that they had been living together as husband and wife. Apparently willingly, both plaintiff and defendant visited Dr. Rydell in March, 1966, and took the three months' old child, William Dean, with them. The purpose was to submit to blood tests and blood groupings, the results of which were to be used as evidence on the question as to whether or not the defendant was the actual father of the child. The blood tests and blood groupings were made and Dr. Rydell gave it as his opinion, based on reasonable medical certainty, that the defendant was not the father. He refused to say it was impossible.

No findings of fact or declarations of law were requested by either litigant, but after the evidence was all in, the court said, in part: "I think you are entitled to know what the Court bases its opinion on. The Court did believe the testimony of Dr. Rydell; there is no question about it and I think it was corroborated testimony as to the child and as to their relations * * *". "The Court now takes up the defendant's cross bill and findings that the plaintiff has committed adultery, and that William Dean is not a child of this marriage". "The thing now left to the Court is what is the best interests for these four children of this marriage. It is a pitiful thing for them. The mother has done a good job of taking care of these children but at the same time she has committed adultery and has a child by another man, which child she shall keep". "Edward should certainly stay with his father. Kenneth and Brett are right on the borderline. If they were babies they certainly should stay with their mother unless she was terribly unfit. * * *". Immediately following these comments the court entered what purports to be the judgment. We set it forth in full except the last paragraph which has to do with the allowance of attorney fee and taxing of costs:

"WHEREUPON, the Court after having seen and heard all the evidence adduced in this cause, being now fully advised in the premises, finds that Plain-

tiff, Dorothy A. Rasco, has committed adultery and that the defendant, Dale Rasco is not the father of William Dean Rasco, and that William Dean Rasco is not a child of this marriage; and that the allegations of plaintiff's petition are not true; that it would be in the best interest of the minor children, Eddie Rasco, Kenneth Rasco and Brett Rasco that they be awarded to Defendant, Dale E. Rasco; that the defendant is the innocent and injured party and is entitled to the relief as prayed for in this cross-petition for divorce and that Plaintiff's petition be and the same is denied.

"It is therefore, Ordered, Adjudged and Decreed by the Court that the plaintiff take nothing by her petition for divorce and that the defendant go hence without day as to said petition.

"It is therefore Decreed by the Court that the defendant be and he is hereby absolutely and forever divorced from the bonds of matrimony heretofore contracted with plaintiff, the same are hereby set aside and for naught held and said defendant be restored to all rights and privileges of an unmarried person.

"It is further Ordered by the Court that the defendant have the care, custody and control of Eddie Rasco, Kenneth Rasco and Brett Rasco, minor children of plaintiff and defendant born of said marriage, and at the beginning of the school year, June 3, 1966, plaintiff shall have the right to see and visit with said minor children at all reasonable and proper times from 6:00 P.M. on Friday until 6:00 P.M. on Sunday, beginning June 10, 1966, said week-end visits to be every other week-end."

It seems apparent that the trial judge concluded that defendant was not the father of William Dean, the infant child, entirely on the basis of the testimony of Dr. Rydell. He seems to have treated such testimony as conclusive and not open to

question in spite of the fact that the doctor refused to say that it was impossible for defendant to be the father of William Dean.

In due time plaintiff filed a motion for new trial, alleging (1) error in granting defendant the divorce and (2) error in awarding defendant custody of the minor children. This motion was overruled and plaintiff filed timely notice of appeal.

In her brief in this court plaintiff lists three points: (1) that the determinative factor in awarding custody is the welfare of the children. We agree that this is so; (2) a child of tender years needs the tender love and affection of a mother and (3) transgression of the moral law does not necessarily betoken depravity, and a single act of adultery need not deprive the delinquent of the custody of minor children. She does not here urge that the trial court erred in granting the divorce to defendant instead of her.

In the first paragraph of the written argument plaintiff says an appeal from the granting of the divorce to the defendant was not taken because these parties were beyond reconciliation and further litigation would only lead to further emotional distress. Such election by the plaintiff is permissible, as to herself, but cannot bind this court as to the rights of the minor children. On this appeal neither litigant offered any oral argument and the defendant-respondent has filed no brief.

As to the custody of the three boys, Edward, Kenneth and Brett Rasco, Edward was 17 years of age at the time of trial and had expressed a desire to become a farmer. It is best that he stay with his father. Appellant concedes the custody issue as to Edward. With respect to Kenneth, then aged 13 years, and Brett, then 7 years old, we observe first that there is something to be said for keeping a group of brothers together. According to the ev-

idence in this case a good home will be provided by either the father or the mother. In view of these facts and in the light of all the circumstances and actions that have transpired in this case which we have portrayed in some detail, we find ourselves unwilling to disturb the order of the trial court as to the custody of Edward, Kenneth and Brett Rasco, minor sons of the parties. We cannot say that the judgment as to these children is clearly erroneous, and therefore, that part of the judgment awarding custody of Edward, Kenneth and Brett Rasco to defendant, is affirmed.

Ordinarily, the foregoing would end this case since it disposes of all of the points raised by plaintiff in her brief. Johnson v. Duensing, Mo., 332 S.W.2d 950. However, we cannot ignore the plight of the infant, William Dean Rasco. Even a casual reading of the transcript in this case imperatively raises the question of the sufficiency of the evidence to support the drastic action of the trial court in declaring that William Dean is not the child of the defendant.

■ Civil Rule 73.01(d), V.A.M.R., provides that in an appeal in a case tried to the court without a jury, as this one was, "The appellate court shall review the case upon both the law and the evidence as in suits of an equitable nature." Further, this rule provides that the sufficiency of the evidence to support the judgment of the trial court may be considered by the appellate court although such question is not properly preserved for review.

Civil Rule 83.13(c), V.A.M.R., provides that on appeal "The appellate court shall examine the transcript on appeal and, * * *, award a new trial or partial new trial, reverse or affirm the judgment or order of the trial court, or give such judgment as such court ought to have given, as to the appellate court shall seem aggreeable to law."

Under these rules our courts have held that, in exceptional circumstances, the ap-

pellate courts can correct obvious errors although the parties do not urge such points in their brief. Thus, in In re Duren, Mo.App., 195 S.W.2d 745, this court reversed the judgment of the trial court on a basis not even mentioned by the appellate in her brief. On transfer, the Supreme Court En Banc (355 Mo. 1222, 200 S.W.2d 343) affirmed the propriety of the action of this court in deciding the case on a basis not urged by the appellant. In Kindred v. Anderson, 357 Mo. 564, 209 S.W.2d 912, the Supreme Court En Banc reached its decision on a basis obviously presented by the record although not urged by appellant and, in fact, on a basis which the appellant attempted to avoid by putting "no trespassing" signs in his brief. The court, on motion for rehearing, pointed out that a lawsuit is something more than a contest between opposing counsel and that the rights of the litigants must be considered.

In both of these cases, the court emphasized the right and duty of the courts, under Civil Rule 79.04, to consider "plain error affecting substantial rights" although not preserved for review by the parties. This rule 79.04 reads as follows:

"Plain errors affecting substantial rights may be considered on motion for a new trial or on appeal, in the discretion of the court, though not raised in the trial court or preserved for review, or defectively raised or preserved, when the court deems that manifest injustice or miscarriage of justice has resulted therefrom."

■ Consideration of such plain error is discretionary with the appellate court and such discretion should be exercised with caution and only where such action is necessary to prevent or remedy manifest injustice or a miscarriage of justice. In the case at bar, we are convinced after very careful consideration of the entire record that the declaration of the trial court as to the infant William Dean Rasco represents

a miscarriage of justice which can only lead to manifest injustice to all concerned. Being so convinced we proceed to express our views on the question of whether or not the evidence is sufficient to support the finding of the trial court that William Dean Rasco is not the son of defendant and a child born of this marriage. We believe that our action in this respect is authorized by the foregoing authorities and by the following cases: Union Electric Co., v. Pfarr, Mo., 375 S.W.2d 1; Allen v. Globe-Democrat Publishing Co., Mo., 368 S.W.2d 460; Irwin v. Globe-Democrat Publishing Co., Mo., 368 S.W.2d 452; Miller v. Ste. Genevieve County, Mo., 358 S.W.2d 28; State ex rel. Alton R. Co. v. Shain, 346 Mo. 681, 143 S.W.2d 233; Wittels v. Dubinsky, Mo., 343 S.W.2d 644; Tilson v. Terminal R. Ass'n. of St. Louis, Mo.App., 236 S.W.2d 42; Riley v. White, Mo.App., 231 S.W.2d 291; and Caddell v. Gulf, M & O R. Co., Mo.App., 217 S.W.2d 751.

As stated in Wells v. Wells, Mo. App., 117 S.W.2d 700, and in many, many other such cases, the state is an interested party in suits for divorce and has a special concern for the welfare of children involved therein. The appellate court reviews such cases de novo on the record and is empowered to enter the judgment that the trial court should have entered. From such review we conclude that the evidence adduced in this case is insufficient to either justify or authorize a conclusion of illegitimacy.

In ancient times, adultery by the woman, at least, was treated as a serious crime. She was stoned but only "if taken in adultery". For centuries gone by and today, there exists in our law a powerful presumption that a child begotten or born in wedlock is legitimate. This is so, because of the serious disabilities attaching to the status of illegitimacy. We shall cite and quote from a few of the multitude of existing authorities so holding.

"While the former arbitrary rule has been relaxed so that the presumption of legitimacy of a child begotten or born in wedlock is now rebuttable by practical methods and substantial evidence, *it remains one of the strongest rebuttable presumptions known to the law, and the interests of society require that it be given effect unless overcome by the strongest sort of evidence, in the absence of which the presumption remains conclusive.*" 10 Am.Jur.2d, Bastards, page 852. (Italics ours.)

The following quotations are from Ash v. Modern Sand & Gravel Co., 234 Mo. App. 1195, 122 S.W.2d 45, 50, 51:

"The strenuous effort made to bastardize the boy claimant, we think signally failed as it deserved to fail. The commission failed to make a finding on this issue. Every child born in wedlock is presumed to be legitimate. Public policy sanctions this view.

\* \* \* \* \* \*

*"Such presumption in favor of the legitimacy of children born in wedlock is the strongest known to the law,* and the courts in their righteous zeal to protect the · innocent offspring will not permit this presumption to be overthrown unless there is no judicial escape from such a malign conclusion.

\* \* \* \*· \* \*

"To overthrow this presumption the evidence must show conclusively that the husband, by reason of absence or otherwise, could not have had sexual intercourse with the wife at the beginning of any reasonable period of gestation." (Italics added.)

Our Supreme Court in Bernheimer v. First Nat. Bank of Kansas City et al., 359 Mo. 1119, 225 S.W.2d 745, 751, quoted with approval the statement in Ash, supra, that the presumption of legitimacy is the strongest known to law.

In F v. F, 333 S.W.2d 320, 326, 327, the St. Louis Court of Appeals said this:

"* * * 'The early commonlaw rule in England was that if a wife had issue while her husband was within the four seas—that is, within the jurisdiction of the King of England—such issue was conclusively presumed to be legitimate, except upon proof of the husband's impotence; and even if he was beyond the four seas, he must have been away for so long a period before the birth of the child as to make it a natural impossibility that he could be the father * * *'. 7 Am.Jur., pg. 636, Sec. 14. For a discussion of the lengths to which the principle was carried, see that authority.

\* \* \* \* \* \*

"The severity of the rule was such that it was modified so that the presumption is no longer conclusive but may be rebutted. Russell v. Russell, 1924, A. C. (Engl.) 687; 13 B.R.C. 246 – H.L. Such is the state of the law today in Missouri. Boudinier v. Boudinier, 240 Mo.App. 278, 203 S.W.2d 89; Ash v. Modern Sand & Gravel Co., supra; Needham v. Needham, Mo.App., 299 S. W. 832. But the burden of proof is on the party asserting the illegitimacy, Jackson v. Phalen, supra, 237 Mo. 142, 140 S.W. 879. *And the burden is indeed an onerous one, for the quantum of evidence necessary to overcome the presumption must be not only clear and convincing,* Stripe by Shannon v. Meffert, 287 Mo. 366, 229 S.W. 762, *but it must be such that no conclusion other than that of illegitimacy can be reached.* Nelson v. Jones, supra, 245 Mo. 579, 151 S.W. 80; Ash v. Modern Sand & Gravel Co., supra." (Italics added)

In Bednarik v. Bednarik, 18 N.J.Misc. 633, 16 A.2d 80, 91, the Court of Chancery of New Jersey had this to say:

"But upon what social theory can the blood grouping test of a defendant and her child in a divorce suit ordered for the purpose of attempting to prove her guilty of adultery, be justified? The public policy does not favor divorce. It regards the family as the social unit, and does not encourage the annulment or dissolution of that relationship. It recognizes, with the strongest presumption, the legitimacy of every child born in wedlock."

It is commonly agreed that the possible period of gestation may and frequently does range at least from seven to eleven months although nine months is the generally accepted time. Here the child was not only conceived and born during wedlock, but admittedly the parties cohabited until March 21, 1965, just nine months and nine days before the birth. The court decided the issue of adultery and illegitimacy almost, if not entirely, upon the testimony of the pathologist who, in turn, arrived at his expert medical opinion wholly upon the results of the blood tests and blood groupings. Many commonly recognized scientific truths of yesterday have become discarded and disproved myths of today. Examples of this fact can be found in almost every field—from the purely religious to the coldly scientific—and including astronomy and evolution. The scientists of years ago solemnly expressed their expert opinions that the earth was flat, that man could never fly or enter outer space, or cause a baseball to curve. Furthermore, we have heard and seen, on too many occasions, too many experts take exactly opposite positions on the same question for us to blindly accept as gospel truth every expressed expert opinion. From time immemorial, our courts have had the duty, the right and the responsibility to weigh the evidence, apply the law and make the ultimate decisions in all court tried controversies. The so-called experts are ready, willing and believe themselves able to assume and take over this decision making responsibility. The social workers and welfare specialists are eagerly waiting to supply the answer to every juvenile or family problem; the trained economists and social planners

**18**

know how every economic or social problem should be solved; construction engineers can tell us positively what caused the bridge to collapse or the airplane to crash, or what made the Titanic an unsinkable ship; labor specialists have definite views on how all labor disputes should be solved and medical experts have an expert opinion on everything, ranging from the degree of disability to all questions concerning insanity or paternity. We believe our courts should retain and not surrender this decision making authority. In our case, even the expert would not assert that his conclusion was based on scientific certainty. In our opinion, the evidence was insufficient to overcome the strong presumption of legitimacy of this child who was born in wedlock, and stamp the word "bastard" across the brow of this infant.

We have long known and respected the high principles and motives which have actuated the trial judge in his every decision. However, we also realize that appellate judges have more opportunity to research before deciding a law question or a mixed question of law and fact. It seems clear too, based upon the one brief filed in this court, that counsel failed to either research or even mention the paternity issue.

■ It therefore follows that the trial court erred in finding that defendant was not the father of William Dean Rasco and in failing to provide for his custody, care and support along with the other children.

The judgment of the trial court is reversed and the cause remanded with directions to enter a judgment, in conformity with this opinion, finding that defendant is the father of William Dean Rasco; that William Dean Rasco is one of the children born of this marriage and awarding custody of said William Dean Rasco to plaintiff with provision for his support by defendant.

SHANGLER, J., not participating because not a member of the court when the cause was submitted.